Timothy W. SWAIN and Katherine A. Swain, Plaintiffs-Appellants,

v.

Claude S. BRINEGAR, Secretary of Transportation for the United States, et al., Defendants-Appellees.

No. 74–1625.

United States Court of Appeals, Seventh Circuit.

Argued Oct. 3, 1974.

Decided April 29, 1975.

---

Mishael O. Gard, and Timothy W. Swain, Swain, Johnson & Gard, Peoria, Ill., for plaintiffs-appellants.

Donald B. Mackay, U. S. Atty., Springfield, Ill., Max Lipkin, Asst. U. S. Atty., Peoria, Ill., Raymond L. Terrell, Springfield, Ill., Larry G. Gutterridge, U. S. Dept. of Justice, App. Div., Washington, D. C., William J. Scott, Atty. Gen., Chicago, Ill., for defendants-appellees.

Before SWYGERT, and LAY,[*] *Circuit Judges,* and GRANT,[**] *Senior District Judge.*

SWYGERT, *Circuit Judge.*

Plaintiffs brought this suit to enjoin further action on a segment of a proposed Federal-Aid Highway project in the state of Illinois. They contend that the procedures used in obtaining the approval of the Federal Highway Administration on the proposed freeway were insufficient in law and in violation of the Federal-Aid Highway Act, 23 U.S.C. § 101 et seq. and the National Environmental Policy Act [NEPA], 42 U.S.C. § 4321 et seq. Specifically, they say that the corridor selection process which took place in 1969 was arbitrary, capricious, and subversive of the legislative policy of full public disclosure and full public participation under the Federal-Aid Highway Act, and that an environmental impact statement [EIS] subsequently submitted in connection with the disputed project was insufficiently detailed under the applicable NEPA standards and illegally delegated to the state highway authorities at the critical drafting stage. They further contend that this suit may be maintained as a class action. On June 3, 1974 the parties consented to a temporary restraining order pending a further hearing on the matter. On June 19, 1974 a consolidated hearing on the merits of the dispute was conducted pursuant to Rule 65(a)(2) Fed.R.Civ.P. Thereafter the trial judge rendered a decision and order dissolving the restraining order and dismissing the complaint on its merits. *Swain v. Brinegar,* 378 F.Supp. 753 (S.D.Ill.1974). Plaintiffs appeal from that order.

I

In 1967, Wilbur Smith and Associates, consulting engineers, submitted a report entitled "Illinois Highway Needs and Fiscal Study" to the Illinois Department of Public Works and Buildings. The re-

port, commissioned in 1964, presented the "findings of comprehensive studies of highway, road, and street needs and financing for complete modernization of the state and local systems to safely and efficiently serve travel requirements during the twenty years, 1966–1985, inclusive." The Smith Report was essentially a predictive analysis of future highway needs and attendant costs. It was based primarily on an evaluation of economic and demographic characteristics and trends as they existed prior to 1967. The report itself recognized that unforeseen changes were likely to occur during the projected period and therefore recommended that "a comprehensive program be established for continual reappraisal" of highway needs. The report made no reference to environmental considerations such as pollution, energy resources, or preservation of tillable soil; it proceeded on the assumption that the pre-1967 population and economic trends would continue, that families would be accumulating larger and larger amounts of disposable income during the prediction period, that the motor vehicle industry would therefore continue to expand, and that "Illinois' growing dependence on highway transportation and the extensive influence of automobile services on all segments of industrial activity" would continue unabated.

The report recommended, inter alia, the completion of a "trunk" system of interstate highways and supplemental freeways. This system was designed to connect every Illinois city of over 25,000 population; upon its completion, no part of the state would be more than 30 miles from one of its component routes. As presented in the report, the trunk system included a supplemental freeway connecting the cities of Peoria and Lincoln, Illinois. At the present time, these two cities are connected by Illinois Route 121, a two lane highway. The Smith Report did not include any specific reference to the particular need for the Peoria-Lin-

---

[*] Circuit Judge Donald P. Lay of the United States Court of Appeals, Eighth Circuit, is sitting by designation.

[**] Senior District Judge Robert A. Grant of the Northern District of Indiana is sitting by designation.

coln freeway or any specific discussion of the inadequacies of Route 121 or the possibility of upgrading this existing facility.

In response to the Wilbur Smith Report, location studies were conducted for a supplemental freeway corridor from Lincoln to Peoria. The Lincoln-Peoria proposal, designated FAP 406, was divided into two component projects. The northerly portion of the freeway project, known as the District 4 project, ran from Peoria on the north to a point between Delavan and Hopedale, Illinois on the south. The southerly portion, which is the subject of this suit, ran from this general area south to an interchange with Interstate I–55[1] just northwest of Lincoln. Prior to the submission of any public report or the holding of any public hearings regarding the suit project, a corridor approval was obtained for the District 4 project. At the time of the initial hearing on the suit project, therefore, the location of the southpoint of the District 4 project had been established adjacent to and west of Route 121 at a point east of Delavan and southwest of Hopedale.[2]

A corridor location report for the suit project was submitted to a public hearing on July 2, 1969. The report discussed and compared three proposed alignments for the project.[3] It did not contain detailed figures or facts as to the need for the project,[4] nor did it consider the alternative of upgrading Illinois Route 121. Discussion of environmental considerations was absolutely minimal and entirely conclusory. While the report did recognize the fact that farmland would be taken out of production, no further evaluation of this fact was made other than the simple recognition that it would happen.

At the corridor public hearing the three proposed alignments were explained to those in attendance. Again, no information was presented as to the need for the freeway other than a reference to the Wilbur Smith Report. Little reference was made to environmental considerations in the initial presentation, and this fact was recognized by several persons who participated in the meeting. When one citizen asked whether the proposed project had necessarily to be a fully controlled-access freeway his question was met with a simple assertion that "the supplemental freeway system is to be completely controlled-access highway." No further explanation or justification was offered. In short, by the time of the submission of the corridor report, the decision to go ahead with the project would seem to have been all but made, and discussion at that point focused mainly on which of the predetermined corridor alignments presented the best alternative.

Plaintiffs contend that this corridor selection process was arbitrary and capri-

1. The exact location of the I–55 interchange was not a settled issue at the time of the corridor location studies, since I–55 was itself in the hearing and design stages at that time. The suit project contemplated two alternative locations for the I–55 terminus, one at the intersection of I–55 and Route 121 and one west of that location a short distance. Two corridor alternatives running west of Route 121 for the suit project would require the westerly interchange at I–55. An alternative corridor running east of Route 121 for the suit project would interchange with I–55 at the Route 121 intersection.

2. At the present time there is an in-place segment of the District 4 project at the Delavan-Hopedale terminus. All corridors thusfar proposed for the suit project have assumed this location to be the logical northern end of the project.

3. These three alignments differ principally in respect to their locations relative to existing Route 121. Plaintiff Swain owns a farm to the west of Route 121. Alternate A, which was recommended by the report and ultimately chosen as the project corridor, has the effect of severing the Swain property.

4. The only references to the need for this supplemental freeway project consist of one sentence devoted to the Smith Report and three sentences and a map indicating that existing Route 121 has a "higher than average accident experience."

cious and in violation of the Federal-Aid Highway Act, 23 U.S.C. § 128 [5] and PPM 20–8 [6] promulgated thereunder. They say that the corridor report and corridor location hearing were merely *pro forma*, that the public at large was never fully

informed of facts which would substantiate the need for the supplemental freeway or justify the selection of the three specific corridor location alternatives presented in the report, and that the public was thus denied the opportunity

**5.** In 1969, 23 U.S.C. § 128 provided:

§ 128. Public hearings

(a) Any State highway department which submits plans for a Federal-aid highway project involving the bypassing of, or going through, any city, town, or village, either incorporated or unincorporated, shall certify to the Secretary that it has had public hearings, or has afforded the opportunity for such hearings, and has considered the economic and social effects of such a location, its impact on the environment, and its consistency with the goals and objectives of such urban planning as has been promulgated by the community. Any State highway department which submits plans for an Interstate System project shall certify to the Secretary that it has had public hearings at a convenient location, or has afforded the opportunity for such hearings, for the purpose of enabling persons in rural areas through or contiguous to whose property the highway will pass to express any objections they may have to the proposed location of such highway.

(b) When hearings have been held under subsection (a), the State highway department shall submit a copy of the transcript of said hearings to the Secretary, together with the certification and report. Pub.L. 90–495, § 24, Aug. 23, 1968, 82 Stat. 828.

**6.** In 1969, PPM 20–8 provided in pertinent part:

1. *Purpose.* The purpose of this PPM is to ensure, to the maximum extent practicable, that highway locations and designs reflect and are consistent with Federal, State, and local goals and objectives. The rules, policies, and procedures established by this PPM are to afford full opportunity for effective public participation in the consideration of highway location and design proposals by highway departments before submission to the Federal Highway Administration for approval. They provide a medium for free and open discussion and are designed to encourage early and amicable resolution of controversial issues that may arise.

The PPM requires State highway departments to consider fully a wide range of factors in determining highway locations and highway designs. It provides for extensive coordination of proposals with public and private interests. In addition, it provides for

a two-hearing procedure designed to give all interested persons an opportunity to become fully acquainted with highway proposals of concern to them and to express their views at those stages of a proposal's development when the flexibility to respond to these views still exists.

4. *Definitions.* As used in this PPM

a. A "corridor public hearing" is a public hearing that:

(1) Is held before the route location is approved and before the State highway department is committed to a specific proposal;

(2) Is held to ensure that an opportunity is afforded for effective participation by interested persons in the process of determining the need for, and the location of, a Federal-aid highway; and

(3) Provides a public forum that affords a full opportunity for presenting views on each of the proposed alternative highway locations, and the social, economic, and environmental effects of those alternative locations.

9. *Consideration of social, economic and environmental effects.* State highway departments shall consider social, economic, and environmental effects before submission of requests for location on design approval, whether or not a public hearing has been held. Consideration of social, economic, and environmental effects shall include an analysis of information submitted to the State highway department in connection with public hearings or in response to the notice of the location or design for which a State highway department intends to request approval. It shall also include consideration of information developed by the State highway department or gained from other contacts with interested persons or groups.

10. *Location and design approval.*

a. This section applies to all requests for location or design approval whether or not public hearings, or the opportunity for public hearings, are required by this PPM.

b. Each request by a State highway department for approval of a route location or highway design must include a study report containing the following:

(1) Descriptions of the alternatives considered and a discussion of the anticipated social, economic, and environmental effects

to have an effective voice in the planning of the freeway project. They further contend that other reasonable alternative corridor locations should have been included in the corridor report, that the report should have given full consideration to upgrading Route 121 in some fashion, and that a detailed discussion of possible environmental impacts of each of the alternative actions should have been presented to the public in order to facilitate reasoned consideration of all alternatives by those affected.

While we agree that the corridor report and hearing could have been more extensive than they were, we also agree with the district judge that there is no evidence of bad faith and that the primary purpose of encouraging public input in the planning stages of this project was served. At the outset of the corridor hearing the public was informed of the general design of the proposed freeway and of twenty-three factors which were considered by the responsible state officials relative to possible social, economic, and environmental effects of the project. Included among these factors were employment, recreation, pollution, aesthetics, and conservation. Public input was therefore invited on a broad range of topics. Written objections were solicited as well as recorded oral statements, and several written objections were received from interested persons including plaintiff.[7]

A full analysis of the three proposed corridor locations was presented in the corridor report and again at the location hearing. PPM 20–8 does not require more than this, but specifically requires only that the study report describe and discuss the "alternatives considered."[8] Moreover, the record indicates that several options not discussed in the corridor report or at the location hearing, including upgrading of Route 121 and the specific alternatives offered by plaintiffs, were in fact analyzed and found less advantageous than the location which was finally adopted. The discussion of environmental considerations, while highly conclusory and somewhat superficial, did indicate that such factors were considered by the Illinois Department of Public Works and Buildings, Division of Highways, and certification of this fact was properly made to the Secretary of Transportation as then required by 23 U.S.C. § 128.

Plaintiffs' real dispute here is with the ultimate selection of alternate A as the corridor to be used in the construction of the freeway. In this regard they make several logical and persuasive arguments favoring some other alignment. After a careful review of the record, however, we are unable to say that the corridor chosen is patently unreasonable or so clearly arbitrary as to justify a reviewing court in substituting its judgment for that of the Federal Highway Administration which approved this corridor. *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1970). Accordingly, we find the corridor selection procedures to have been valid under the law as it existed in 1969 and the ultimate choice of corridor A to be beyond the proper limits of this Court's power of review.[9]

of the alternatives, pointing out the significant differences and the reasons supporting the proposed location or design. In addition, the report must include an analysis of the relative consistency of the alternatives with the goals and objectives of any urban plan that has been adopted by the community concerned. 34 Fed.Reg. 727 (1969).

It should be noted that no written report was required by 23 U.S.C. § 128, from which this Policy and Procedure Memorandum was derived, until 1970, well after the corridor approval proceedings in this case.

7. The Swains presented their objections and suggestions on July 10, 1969, eight days after the corridor location hearing. These objections were made a part of the record of the corridor hearing and were transmitted therewith to the Federal Highway Administration.

8. *See* PPM 20–8, § 10 *supra* note 6.

9. This finding does not mean that corridor A will necessarily be used for the project. As we will point out, data disclosed in the environmental impact statement to be prepared by

## II

Having held that the procedures used in 1969 in selecting the corridor for the southerly portion of FAP 406 were valid under 23 U.S.C. § 128 and PPM 20–8, we come to the more difficult question of whether subsequent enactment of the National Environmental Policy Act, 42 U.S.C. § 4321 *et seq.* requires a reevaluation of the project, and whether, if NEPA has not been fully complied with, this project must be enjoined until compliance is obtained. For the reasons which follow, we hold that NEPA does require a full review of the suit project, that such a review has not yet been conducted in compliance with the act, and that further action on this portion of FAP 406 must therefore be enjoined pending a full review and determination by the Federal Highway Administration whether this highway should be built as presently planned.

On January 1, 1970 the National Environmental Policy Act became law.[10] Under the act, all agencies of the Federal Government are to include in their consideration and development of major federal actions having significant effect on the environment a "detailed statement by the responsible official" on five specific aspects of the proposed action. They are: "(i) the environmental impact of the proposed action, (ii) any adverse environmental effects which cannot be avoided should the proposal be implemented, (iii) alternatives to the proposed action, (iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and (v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented." 42 U.S.C. § 4332(2)(C).

This detailed statement is to be issued only after the "responsible federal official" has obtained input from every federal agency which has "jurisdiction by law or special expertise with respect to any environmental impact involved." *Id.* In addition, comments and views of appropriate state and local agencies are to be solicited and appended to the statement. Upon its completion, this report is to be "made available to the President, the Council on Environmental Quality and to the public . . ., and [it is to] accompany the proposal through the existing agency review processes. . .." *Id.*

Finally, the Act provides that these provisions shall be applied by all Federal agencies to the "fullest extent possible." 42 U.S.C. § 4332(1). We have previously held that this provision requires evaluation of ongoing projects like the suit project under NEPA:

The defendants also claim that Section [4332] of NEPA does not apply to Highway 16 because this project was in progress prior to January 1, 1970, the effective date of the Act. Although the Act is not to be given retroactive effect, it does apply, as the defendants recognize, to certain projects "ongoing" when the Act became effective. Considering the Congressional command that the Act be complied with "to the fullest extent possible," an ongoing project is subject to the requirements of Section [4332] until it has reached that stage of completion where the cost of abandoning or altering the proposed project clearly outweigh [sic] the benefits which could flow from compliance with Section [4332]. Arlington Coalition on Transportation v. Volpe, 458 F.2d 1323, 1332 (4th Cir. 1972). Here final federal approval for the project did not occur

the Federal Highway Administration may well dictate a reopening of the corridor selection process. However, if no such environmental data is developed, the 1969 corridor selection will stand and no new corridor hearings will be required. We believe that this approach fully complies with the command of the National Environmental Policy Act that "public

laws of the United States shall be interpreted and administered in accordance with the policies set forth" in that act. 42 U.S.C. § 4332(1). *Cf. Lathan v. Brinegar*, 506 F.2d 677, 687–88 (9th Cir. 1974).

10. Pub.L. 91–190, § 2, Jan. 1, 1970, 83 Stat. 852.

until over one year after the effective date of the Act. Actual construction was not commenced until almost two years later. Too, the defendants make no claim that they could not have satisfied, the procedures outlined in Section [4332]. We hold, therefore, that the issuance of the preliminary injunction did not extend retroactive effect to NEPA. *Scherr v. Volpe,* 466 F.2d 1027, 1034–35 (7th Cir. 1972).

*See also Barta v. Brinegar,* 358 F.Supp. 1025 (W.D.Wis.1973). Since construction has not commenced on the suit project, it is nowhere near "that stage of completion where the cost of abandoning or altering the proposed project clearly outweigh[s] the benefit[s] which could flow from compliance with Section [4332]." Therefore NEPA requires that an environmental impact statement be prepared for this project prior to any decision to commit federal funds to its completion.

### III

On August 16, 1972 a draft environmental impact statement for the suit project was submitted to the Federal Highway Administration by the Illinois Department of Transportation. This draft consisted of approximately forty-six pages of textual material and numerous maps, charts, and pictures. Its organization was patterned after the requirements of NEPA, and each of the five areas specified in that act was accorded a separate section. A close examination of the draft reveals, however, that the report was rather superficial in several key areas.[11] In fact, this draft EIS, like the corridor location study, seems to have proceeded from the assumption that the freeway would be built and that the only questions remaining to be answered were which precise alignments and which design features

were to be chosen within the previously selected corridor.

Thus, discussion of the need for the proposed freeway was limited to one page of conclusory statements. No consideration of the alternative of upgrading existing Route 121 was presented beyond a simple recitation that such an alternative existed. The alternative of no new construction whatever was dealt with in a single paragraph which relied on "statewide needs studies," presumably referring to the Wilbur Smith Report, though this was never made clear. Alternative alignments were rejected on the basis of the previous corridor selection process, which was conducted prior to the effective date of NEPA.

This draft was circulated to the appropriate federal, state, and local agencies for comment. After the views of these agencies were received, the Illinois Department of Transportation prepared the final EIS. An examination of the final statement indicates little substantive change from the original draft. For example, in response to criticisms and suggestions regarding the upgrading of Route 121 by the Illinois Natural History Survey the final draft merely refers back to the elimination of alternatives which took place during the corridor selection process. Similarly, in response to the suggestion by the Environmental Protection Agency that loss of farmland could be considered an adverse effect, the final EIS merely adds two sentences:

> When considering adverse effects, one that should not be overlooked is the loss of over 700 acres of tillable land. This change in land use brings about many side effects that are never fully noted.

There is no indication in the EIS as to what these side effects might be. Thus, in sum and substance the final draft is

---

11. In its initial review letter, the United States Department of Interior described the draft EIS as follows:

> The statement itself contains many generalities, is lacking in specific information, and inadequately treats the natural environmental resources associated with the project.

Letter of November 14, 1972 from Burton H. Atwood, Field Representative for the Secretary of the Interior, to H. W. Monroney, District Engineer, District # 6, Illinois Department of Transportation.

identical to the original state-prepared draft with a few superficial changes and deletions.

On November 9, 1972 the final EIS was submitted to the public at a design public hearing. At the same time a design location study was also submitted. Discussion at this hearing was generally limited to specific design features, although the inadequacies of existing Route 121 were discussed in some detail from a safety standpoint. On October 23, 1973 design approval for the proposed project was given to the Illinois Department of Transportation.

■ The district judge held that the final EIS was "sufficiently detailed to satisfy the requirements of NEPA." 378 F.Supp. at 759. His further discussion of the adequacy of the impact statement is instructive:

Plaintiffs assert that the statement filed for FAP 406 fails to explore in sufficient detail alternatives to the proposed route and that it does not explore certain relevant environmental questions in adequate depth. A number of inquiries are suggested by the plaintiffs which they believe should have been made, including extensive chemical pollution tests, the desirability of alternative modes of transportation, and the effect of the removal of farmland from production on the world hunger problem. While unending study of these matters would, no doubt, be beneficial, the failure of the defendants to conduct such studies and to arrive at conclusions thereon here does not render the impact statement inadequate. These questions have a general significance that extends far beyond the limited project envisioned here. It is simply not feasible to hold up a project such as this pending such studies. It would be grossly impractical to do so. An exhaustive examination of every conceivable minor environmental effect of a given project, even though patently and cumulatively detrimental, is simply not required by NEPA.

Nor does the defendants' failure to reconsider in greater depth the available alternatives to the proposed corridor invalidate the EIS. It is evident that the corridor selection process was reviewed during the preparation of the impact statement, at least partly at the suggestion of the FHWA. At that time the defendants apparently concluded that the selection of the recommended corridor was reasonable and that no new circumstances had arisen in the meantime which justified reopening the matter. This approach is not inconsistent with the mandate of NEPA that the Act be complied with to the "extent possible." See Citizens to Preserve Foster Park v. Volpe, 466 F.2d 991, 997 (CA 7 1972). *Swain v. Brinegar,* 378 F.Supp. 753, 759–60 (S.D.Ill.1974).

But we believe that one of the fundamental purposes of NEPA is to require consideration of questions of general or broad significance, such as chemical pollution, alternative modes of transportation, and world resource exploitation. The act expressly requires recognition of "the worldwide and long-range character of environmental problems," 42 U.S.C. § 4332(2)(E), and one of the specific elements to be studied in the EIS is "the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity." 42 U.S.C. § 4332(2)(C). Thus NEPA is clearly intended to focus concern on the "big picture" relative to environmental problems. It recognizes that each "limited" federal project is part of a large mosaic of thousands of similar projects and that cumulative effects can and must be considered on an ongoing basis.

■ Furthermore, a simple "review" of the corridor selection process is wholly insufficient as a "detailed" consideration of alternatives to the proposed action under section 4332(2)(C). The corridor selection process here did not focus on environmental considerations to any significant degree whatever, and at no point

in that process was there any evidence of a detailed consideration of comparative environmental impacts of any of the major alternatives. More importantly, by deferring to the earlier corridor selection process, the ultimate question of whether this fifteen mile segment should be built at all was almost entirely overlooked.[12] Clearly, this approach falls far short of fulfilling the basic function of ensuring

> that each agency decision maker has before him and takes into proper account all possible approaches to a particular project (including total abandonment of the project) which would alter the environmental impact and the cost-benefit balance. Only in that fashion is it likely that the most intelligent, optimally beneficial decision will ultimately be made. *Calvert Cliffs' Coordinating Comm., Inc. v. United States Atomic Energy Comm'n,* 149 U.S.App.D.C. 33, 449 F.2d 1109, 1114 (1971).

We do not find it necessary, however, to suggest what further discussions or considerations within this particular EIS would be necessary to meet NEPA standards. Rather, we confine ourselves to a more fundamental problem, namely, the delegation of responsibility for researching and drafting the impact statement to the Illinois Department of Transportation. Such a delegation is in direct conflict with the language of section 4332(2)(C). That section clearly addresses itself to the actions of federal agencies and federal officials. In pertinent part, section 4332(2)(C) provides:

The Congress authorizes and directs that, to the fullest extent possible: (1) the policies, regulations, and public laws of the United States shall be interpreted and administered in accordance with the policies set forth in this chapter, and (2) all agencies of the Federal Government shall—

.    .    .    .    .

(C) include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on—

(i) the environmental impact of the proposed action,

(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,

(iii) alternatives to the proposed action,

(iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

Prior to making any detailed statement, the responsible Federal official shall consult with and obtain the comments of any Federal agency which has jurisdiction by law or special expertise with respect to any environmental impact involved. Copies of

12. Also overlooked in this approach is the appropriateness of considering the Peoria-Lincoln supplemental freeway in two segments rather than as a single project for purposes of NEPA review. As the Eighth Circuit has observed:

> [I]n order to comply with the spirit and objectives of NEPA . . . to cause a meaningful consideration of environmental effects along with a consideration of alternatives, the minimum length of state highway projects that are supported in part by federal funds must be extended to embrace

projects of a nature and length that are supportable by logical termini at each end. *Indian Lookout Alliance v. Volpe,* 484 F.2d 11, 19 (8th Cir. 1973).

On the face of this record, the logical termini for the FAP 406 project would seem to be the cities to be connected by the freeway: Lincoln and Peoria. There is no apparent "independent utility" in constructing either of the smaller segments, and the mere existence of a boundary line separating arbitrary state highway department districts does not in itself establish a logical terminus.

such statement and the comments and views of the appropriate Federal, State, and local agencies, which are authorized to develop and enforce environmental standards, shall be made available to the President, the Council on Environmental Quality and to the public as provided by section 552 of Title 5, and shall accompany the proposal through the existing agency review processes;

Thus, it is the federal official who is to make the detailed statement after consultation with other interested federal agencies.[13] Nothing in the act intimates that this central function is to be delegated, and the entire thrust of the act weighs heavily against delegation to local or state officials.[14] Indeed, such a delegation invites the very problems we find reflected in this impact statement.

■ The National Environmental Policy Act is, as its name suggests, aimed at protecting the environmental health of the nation as a whole as well as that of each of its separate parts. In few areas is the importance of this broad policy as clear as it is in the area of highway construction, and in particular the area of major interstate and interurban highways. Such highways have a profound influence on "population growth, high-

density urbanization, industrial expansion, [and] resource exploitation." 42 U.S.C. § 4331. While highways of this type are often needed desperately by a population with a real and particular need to travel and expand, it is also true that such highways often create demands for travel and expansion by their very existence.[15] Thus, almost any sponsor of a major four lane highway project can say with some assurance that if the highway is built it will be used and auto travel will be safer, faster, and more efficient because of it. In short, "need" is often a self-fulfilling prophesy in the area of major highway construction.

Moreover, the apparent "need" for such a highway project may well seem the greatest to those closest to it. Certainly it can be predicted that for those whose responsibility it is to propose and construct such highways, the tendency will be to develop a dedication or loyalty to projects which have advanced to the public hearing stages or beyond. This can hardly be avoided given human nature. In the present instance, for example, the Lincoln-Peoria project had advanced well beyond the public hearing stages by 1970. In fact, construction had already begun for the northerly segment of that project. Under these cir-

---

**13.** See Judge Lay's dissent in *Iowa Citizens for Environmental Quality, Inc. v. Volpe,* 487 F.2d 849, 855–58 (8th Cir. 1973).

**14.** The district judge misconstrued the nature of NEPA's command relative to the impact statement. He saw its command as merely requiring "the responsible federal official [to] *provide* an EIS." 378 F.Supp. at 760. The language of the Act belies this construction. Under the act the EIS is described as "a detailed statement *by* the responsible official." (emphasis added.) The act goes on to say that "[p]rior to *making* any detailed statement, the responsible Federal official shall consult . . . and obtain . . . comments . . . ." (emphasis added.) Clearly the act contemplates the EIS being prepared by the federal official in the first instance. For this reason PPM 90–1, a procedural memorandum issued by the United States Department of Transportation, and which provides for state preparation of the initial EIS draft, is entitled to scant consideration. Whatever effect an administrative interpretation may have when the com-

mand of legislation is in some way ambiguous, when the congressional command is clear, as we believe it to be here, it is simply beyond the power of an administrative agency to alter that command or to avoid its effect. *See, e. g., Social Security Board v. Nierotko,* 327 U.S. 358, 368–70, 66 S.Ct. 637, 90 L.Ed. 718 (1946).

**15.** Thus, the Wilbur Smith Report recognizes that

[w]here conditions are favorable for economic expansion, highways can serve as catalysts.

. . . . .

The impact of highways on land use is illustrated by the development along the Edens Expressway in Chicago. It is evident that industries have invested large sums in new facilities located on land adjacent to this facility and that plants and population have been attracted to the area where adequate transportation is available.

*Illinois Highway Needs and Fiscal Study* at p. 35.

cumstances there is at least a grave possibility that the EIS requirement was viewed by the state as merely a procedural hurdle to be contended with in order to complete an ongoing project to which the state had made relatively extensive financial and administrative commitments.[16]

Finally, state agencies simply are not in a position to evaluate environmental consequences of a national or worldwide scope.[17] To require them to do so is to invite substantial duplication of effort and widely varying results.[18] State agencies quite properly look first to the interests of their own state; this is inherent in the design of a federal union. And such agencies are subject to political pressures which can often make de-

tached evaluation of their own projects quite difficult. The result is that state drafted impact statements may slight or completely ignore essential national concerns, and these deficiencies may successfully be masked by use of general, nonspecific language within the EIS itself. Once such a delegation process is established, it is not unlikely that the responsible federal agency will accept the original draft with little comment or change as was done here.

This danger must be avoided. It is simply no answer to rely on either the federal agencies to review state-drafted impact statements or on the federal courts to determine the adequacy of this second-hand review.[19] The key to NEPA is that the federal agency must consider

16. *See* Comment, *The Preparation of Environmental Impact Statements by State Highway Commissions*, 58 Iowa L.Rev. 1268 (1973), for a thoughtful evaluation of the problems inherent in state preparation of impact statements for major highway projects.

17. Thus, the district judge believed that "chemical pollution . . . alternative modes of transportation . . . and . . . the world hunger problem . . . have a general significance that extends far beyond the limited project envisioned here." 378 F.Supp. at 760. It is not unlikely that state officials may take the same view. Indeed, it would be entirely logical for them to do so since they have limited access to the kinds of information required to accurately evaluate many of these and similar problems.

18. Obviously, there is little to recommend a procedure whereby various officials and departments in each of the fifty states independently research and evaluate such problems. Beyond the duplication of expense, such a procedure is anomalous in light of the policies and goals reflected in section 4331 of the act:

§ 4331. Congressional declaration of national environmental policy

(a) The Congress, recognizing the profound impact of man's activity on the interrelations of all components of the natural environment, particularly the profound influences of population growth, high-density urbanization, industrial expansion, resource exploitation, and new and expanding technological advances and recognizing further the critical importance of restoring and maintaining environmental quality to the overall

welfare and development of man, declares that it is the continuing policy of the Federal Government, in cooperation with State and local governments, and other concerned public and private organizations, to use all practicable means and measures, including financial and technical assistance, in a manner calculated to foster and promote the general welfare, to create and maintain conditions under which man and nature can exist in productive harmony, and fulfill the social, economic, and other requirements of present and future generations of Americans.

(b) In order to carry out the policy set forth in this chapter, it is the continuing responsibility of the Federal Government to use all practicable means, consistent with other essential considerations of national policy, to improve and coordinate Federal plans, functions, programs, and resources . . . .

If the requirement of an environmental impact statement for major federal actions is designed to further the fulfillment of "the continuing responsibility of the Federal Government to use all practicable means . . . to improve and *coordinate* Federal plans, functions, programs, and resources . . . ." (emphasis added), it seems odd that this central function (the EIS) should be delegated to state officials who have little means, motivation, or indeed power to effectively coordinate such federal actions.

19. *See Conservation Society of Southern Vermont, Inc. v. Secretary of Transportation*, 508 F.2d 927, 930–34 (2d Cir. 1974); *but see Citizens' Environmental Council v. Volpe*, 484 F.2d 870, 873 (10th Cir. 1973), *cert. denied*, 416 U.S. 936, 94 S.Ct. 1935, 40 L.Ed.2d 286 (1974);

and evaluate environmental impacts before it determines whether or not to move ahead on a given project. The decision on the project itself is to be made only after preparation of the draft EIS and solicitation of views and comments from "federal, state and local agencies." By the time a state agency reaches the point when an EIS becomes necessary, its decision can fairly be said to have been made, at least with respect to whether the particular highway should be built.[20] Delegation of the research and drafting of the initial EIS to such an agency therefore precludes that impartial assessment of environmental consequences which lies at the heart of the National Environmental Policy Act.

As the Ninth Circuit has recently pointed out in its *en banc* opinion in *Lathan v. Brinegar*, 506 F.2d 677 (9th Cir. 1974),

> NEPA is essentially a procedural statute. Its purpose is to assure that, by following the procedures that it prescribes, agencies will be fully aware of the impact of ther [sic] decisions when they make them. The procedures required by NEPA, 42 U.S.C. § 4332(2)(C), are designed to secure the accomplishment of the vital purpose of NEPA. That result can be achieved only if the prescribed procedures are faithfully followed; grudging, *pro forma* compliance will not do. *Id.* at 693.

In this respect we believe the clear requirement that the "responsible federal official" prepare the EIS for all major federal projects must be strictly enforced. Such a construction not only guarantees that the research and preparation of the EIS will be free of the conscious and subconscious effects of self-serving bias, but it will also avoid the necessity of reviewing each delegated impact statement for substantive content and sufficient federal input. It is difficult for a court to determine when federal review amounts to a "rubber stamp" within the context of an apparently "detailed" and often sophisticated impact statement. More importantly, it may be impossible for either a court or a federal agency to tell when some environmental concern peculiar to a given project has been entirely omitted from such a statement. Rigorous adherence to the statutory procedures will substantially avoid these problems.

### IV

In Count II of their complaint, plaintiffs seek to bring this action as representatives of two alleged classes of people pursuant to Rule 23, Fed.R.Civ.P. The classes are defined in the complaint as

> (a) all owners and tenants and users of farm land in the State of Illinois who are subject to having farm land they own and farm land from which they make their livelihood condemned for the purposes of the construction of public highways, without being afforded fair notice and hearing and afforded the protection of the National Environmental Protection [sic] Act of 1969, and (b) all owners and tenants and users of farm land in the State of Illinois who are subject to having farm land they own and farm land from

*Iowa Citizens for Environmental Quality, Inc. v. Volpe*, 487 F.2d 849, 853–54 (8th Cir. 1973); *Life of the Land v. Brinegar*, 485 F.2d 460, 467–68 (9th Cir. 1973), *cert. denied*, 416 U.S. 961, 94 S.Ct. 1979, 40 L.Ed.2d 312 (1974); *Sierra Club v. Lynn*, 502 F.2d 43, 59 (5th Cir. 1974).

20. In the case of the suit project this predetermination is reflected in the cover letter which accompanied the state-drafted EIS to the Federal Highway Administration:

> Attached for distribution by your office are 18 copies of a draft environmental statement for the portion of Supplemental Freeway FAP Route 406 from Lincoln to the Delavan Junction.
> I request that you process the attached statements as quickly as possible to avoid any unnecessary delay in this project.

It seems clear from the tenor of this letter that the EIS was viewed by the state agency as a step along the way in an ongoing project and not as part of the process of determining whether a project should be undertaken in the first instance.

which they make their livelihood condemned for the purpose of the construction of Federal Aid Route 406 and including those who have already conveyed or agreed to convey their property under threat of condemnation.

■ A comparison of the two proposed classes with the complaint in this suit indicates that the breadth of these classes outstrips the scope of the complaint and reliefs sought therein. The complaint specifically describes its subject matter as "a segment of a proposed road improvement known as Freeway FAP 406, [which] extends from northwest of Lincoln to approximately 2 miles north of the Delavan junction in Logan and Tazewell Counties, Illinois." It is difficult to see how farmers in areas unaffected by this segment of FAP 406 would have standing to press a claim in this context. Plaintiffs invoke NEPA only insofar as that act "requires that the Defendants protect the environment of the *affected farm land*" (emphasis added), that is, those farms in the path of one or more of the corridor alignments proposed for this particular project. There is no allegation that persons other than the owners and lessees of these particular farms will be affected by the suit project, and it follows that other farmers in the State of Illinois lack standing to bring this suit. *Sierra Club v. Morton*, 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972).

■ Once the class is limited to those farmers actually threatened by the suit project, two difficulties become apparent. First, as the district court pointed out, there is a necessary antagonism between the plaintiffs and those whose farms might be severed if some alternative corridor location for this project were selected. In addition, there is at least a possibility that some of those who have "already conveyed or agreed to

convey their property" will have an interest in the integrity of their bargain with the state, and also oppose any change in the corridor selection for this project. 378 F.Supp. at 756. Thus, the Swains cannot meet the requirement of Rule 23(a)(4) Fed.R.Civ.P., that they "will fairly and adequately protect the interests of the class." Second, when the class is limited to those whose farms lay in the path of the suit project, it is not at all clear that these people represent a class so numerous that joinder of all members would be impractical. Rule 23(a)(1), Fed.R.Civ.P.

Since there are apparently conflicting interests involved here, and since the owners of properties lying along any of the proposed corridors or along any other reasonable corridor are readily discoverable,[21] we believe that the interests of justice are best served by requiring notice and request for joinder rather than determination of a class with an opting-out procedure.

We therefore affirm the dismissal of Count II of the complaint.

## V

■ Because the Federal Highway Administration has failed to conduct an independent, in-depth study of the potential environmental impact of the suit project as required by NEPA, further work on this federally funded highway must cease until such a study is conducted and a proper EIS drafted. This EIS must fully comply with the mandates of NEPA. It must realistically consider all reasonably available alternatives to the proposed project, including no project at all. Analysis of these alternatives must be "detailed" and must reflect meaningful evaluation not only of purely local considerations, but of any significant national or worldwide implications as well.[22] If this study indicates

21. It appears from an examination of the record and exhibits on file in this case that this information may be readily obtained from the Illinois Department of Transportation.

22. We recognize, of course, that not every project of this type will have national or worldwide implications in and of itself. We do believe, however, that these projects should be

that the project should be built as planned, the review process will recommence with a design public hearing, at which time the EIS will be made available to those in attendance. If the study indicates that this project should be modified in some significant way, new corridor public hearings may be required to consider locations suggested by the environmental findings therein. Finally, if the study indicates that the environmental costs of this project are prohibitive, federal funds may be withdrawn from this project as the Federal Highway Administration sees fit.

The order of the district court is reversed and the case is remanded to that court with direction to retain jurisdiction pending submission of a proper EIS by the Federal Highway Administration. Upon submission of that EIS, the district court shall make such further order as it deems appropriate consistent with this opinion.

GRANT, *Senior District Judge* (dissenting).

I respectfully dissent from that portion of the Court's opinion which holds that there was, in this case, an unlawful delegation of authority with respect to the Environmental Impact Statement (EIS) required by Title 42, U.S.C. § 4332(2)(C).

We are here concerned with the construction of a 15-mile segment in the interstate highway system in the State of Illinois—a "missing link" that would connect the cities of Lincoln and Peoria in that system.

As the Court correctly points out, on August 16, 1972, a draft EIS was submitted to the Federal Highway Administration by the Illinois Department of Transportation. The summary sheet thereof reads as follows:

FINAL DESIGN ENVIRONMENTAL STATEMENT

SUMMARY SHEET

(1) *TYPE OF ACTION*
Administrative Action

( ) Draft             (x) Final
(x) Environmental Statement
( ) Combination   Environmental/Section 4(f) Statement

(2) *BRIEF DESCRIPTION OF THE IMPROVEMENT*
    The proposed Freeway F.A.P. 406 is a four-lane, fully access controlled facility extending north from Lincoln to Morton. The Freeway begins at an interchange with I–55 northwest of Lincoln and ends at an interchange with I–74 at Morton. The segment considered in this report extends from northwest of Lincoln to approximately two miles north of the Delavan Junction, in Logan and Tazewell Counties in Central Illinois.

(3) *SUMMARY OF ENVIRONMENTAL IMPACT*
    Approximately 800 acres of various land use types, 95% farmland and 5% pasture will be needed for this improvement. The Freeway will change the noise, air and water pollution elements in the area along with variations of natural grades due to construction. The small communities within the influence of the Freeway will experience possible major changes in economic structure due to developments that may occur near interchange locations.

    The adverse environmental effects that cannot be avoided are the loss of highly productive agricultural land, the relocation of several farm residences, and revision of local land ac-

viewed and evaluated in context with other similar projects throughout the nation to the extent that such evaluation may provide a basis for judgments as to large scale environmental priorities. Thus, for instance, while a single freeway project through farmlands may have negligible effect on world or national food problems, a major trend toward construction of many of these projects nationwide may have definite implications in these or other areas. One of the primary functions of an EIS is the isolation and evaluation of such trends.

cess patterns in the rural areas. These effects will be corrected by re-establishing the natural eco-systems as close as possible and practical.

### (4) ALTERNATIVES CONSIDERED

Alternatives to the proposed project are: a.) upgrading existing Illinois Route 121 to a full-access controlled high speed facility, b.) constructing a full-access controlled Freeway on a new alinement which would serve the same traffic as existing Illinois Route 121 and c.) not to construct the highway improvement.

Obedient to the commands of Section 4332(2)(C), the Federal Highway Administration thereupon submitted the proposed project to a long list of federal and state agencies who, conceivably, could have had an interest, or any input, into the federal decision-making practice. Many of those queried made written replies.

A list of the agencies from which comments were requested, together with an indication of those from whom responses were received, is quoted here from the EIS:

### (5) LIST OF AGENCIES FROM WHICH COMMENTS WERE REQUESTED

#### FEDERAL AGENCIES

Department Of Agriculture *
Department Of Commerce
Economic Development Administration
Federal Power Commission
Corps Of Engineers *
Department Of Housing And Urban Development *
Director of Impact Statements Offices, U. S. Department Of Interior (7) *
U. S. Environmental Protection Agency (5) *
Department Of Health, Education And Welfare
Office Of The Secretary (TEU), U. S. Department Of Transportation *
U. S. Council On Environmental Quality

* Written replies were received from these agencies.

### STATE AGENCIES THROUGH THE STATE CLEARINGHOUSE:

* Department Of Agriculture
* Department Of Public Health
* Department Of Conservation (x)
* Department Of Business And Economic Development
* Department Of Mines And Minerals (x)
* Division Of Waterways (x)
* Environmental Protection Agency (x)
Department of Corrections (x)
Governor's Office Of Manpower Development
Department Of Aeronautics (x)
Governor's Office Of Human Resources (x)
Board Of Vocational Rehabilitation (x)
Office Of Comprehensive Health Planning (x)
Children & Family Services (x)
Illinois Natural History Survey (x)
Illinois Archaeological Survey
Department Of Local Governmental Affairs (x)
Illinois State Geological Survey (x)

(x) Written replies were received from these agencies.

### OTHER AGENCIES

Lincoln Chamber Of Commerce
Kickapoo Watershed Committee
Logan County Plan Commission
City Of Lincoln Plan Commission
Illinois Central Railroad
Gulf Mobile & Ohio Railroad
Logan County Highway Department
Tazewell County Highway Department
Peoria Tri-County Regional Planning Commission
Logan County Soil Conservation Service
Tazewell County Soil Conservation Service
Logan County Farm Bureau
Tazewell County Farm Bureau
Logan County Board Of Commissioners
Tazewell County Board Of Commissioners
Emden Village Clerk
Hartsburg Village Clerk
Delavan City Clerk

No written replies were received from these agencies.

* Agencies are coordinated under the National Resources Development Board of the State of Illinois.

(6) *THE DRAFT ENVIRONMENTAL STATEMENT WAS MADE AVAILABLE TO THE COUNCIL ON ENVIRONMENTAL QUALITY ON SEPTEMBER 28, 1972*

The majority here would "agree with the district judge that there is no evidence of bad faith and that the primary purpose of encouraging public input in the planning stages of this project was served." They also hold that the corridor hearing, which resulted in the selection of alternate A for this segment of highway, was not "so clearly arbitrary as to justify a reviewing court in substituting its judgment for that of the Federal Highway Administration which approved this corridor." But they then complain that the EIS, consisting of "forty-six pages of textual material and numerous maps, charts and pictures," was on "close examination . . . rather superficial in several key areas." Having concluded that the EIS was inadequate, in their view, they then proceed to decide that the Illinois Department of Transportation had too much input into the initial stages of the process, and that this constituted an improper delegation of authority and that, therefore, the inadequate EIS was void *ab initio.*

It is important that we keep in mind the fact that we are not here dealing with broad policy questions and the pros and cons of a broad network of Interstate Highways, or even at what point an Interstate Highway should bisect the State of Illinois. We are here wrestling with a question involving a 15-mile segment of a previously planned network that needs to be built to complete the freeway system connecting the cities of Peoria and Lincoln. Three alternate corridors had been considered, involving, as they did, the individual interests of competing land owners.

After the Federal Highway Administration had submitted the proposed project to all the agencies listed above, and had given them all an opportunity to comment, the FWA thereafter adopted as its own a 155-page Environmental Impact Statement, as contemplated by Section 4332(2)(C) and work was to proceed. It was then that the aggrieved land owner (plaintiff herein), who had been given every opportunity to be heard, and who was heard, filed this suit to stop the program.

My brethren write that "nothing in the Act intimates that this central function is to be delegated." To me, it is equally clear that nothing in the Act states that "the responsible official" must himself perform all the multitude of duties that go into the decisionmaking process envisioned by the Environmental Protection Act.

I quote with approval from the able opinion of the district court:

Plaintiffs assert that the statement filed for FAP 406 fails to explore in sufficient detail alternatives to the proposed route and that it does not explore certain relevant environmental questions in adequate depth. A number of inquiries are suggested by the plaintiffs which they believe should have been made, including extensive chemical pollution tests, the desirability of alternative modes of transportation, and the effect of the removal of farmland from production on the world hunger problem. While unending study of these matters would, no doubt, be beneficial, the failure of the defendants to conduct such studies and to arrive at conclusions thereon here does not render the impact statement inadequate. These questions have a general significance that extends far beyond the limited project envisioned here. It is simply not feasible to hold up a project such as this pending such studies. It would be grossly impractical to do so. An exhaustive examination of every conceivable minor environmental effect of a given project, even though patently and cumulatively detrimental, is simply not required by NEPA.

Is there not room for a rule of reason in the application of these statutes? The extent of detail required by NEPA in a

highway case such as the one at hand, is well expressed in Iowa *Citizens for Environmental Quality, Inc. v. Volpe*, 487 F.2d 849 (8th Cir. 1973) as follows:

"However, strict though the procedural requirements of Section 102(2) may be, they must be interpreted on a basis of reasonableness. *Environmental Defense Fund, Inc. v. Corps of Engineers*, 470 F.2d 289, 297 (8th Cir. 1972). ' . . . [I]f this requirement is not rubber, neither is it iron. The statute must be construed in the light of reason if it is not to demand what is, fairly speaking, not meaningfully possible, given the obvious, that the resources of energy and research—and time—available to meet the Nation's needs are not infinite.' *Natural Resources Council, Inc. v. Morton*, 148 U.S.App.D.C. 5, 458 F.2d 827, 837 (1972). See *Environmental Defense Fund, Inc. v. Corps of Engineers*, 348 F.Supp. 916, 933 (N.D.Miss.1972); *Environmental Defense Fund, Inc. v. Corps of Engineers*, 342 F.Supp. 1211, 1217 (E.D.Ark.1972).

"As Judge Stuart noted, the environmental statement 'to some extent must be examined in light of the particular facts and circumstances surrounding the project . . . in order to determine its sufficiency. The extent of detail required must necessarily be related to the complexity of the environmental problems created by the project.' The discussion of environmental effects need not be 'exhaustive' but rather need only provide sufficient information for a 'reasoned choice of alternatives.' *Natural Resources Defense Council, Inc. v. Morton*, 148 U.S.App.D.C. 5, 458 F.2d 827, 836 (1972). See *Sierra Club v. Froehlke*, 345 F.Supp. 440, 444 (W.D. Wis.1972), where the court stated that Section 102(2) does not require that 'each problem be documented from every angle to explore its every potential for good or ill.' "

By Footnote 13 the majority opinion refers in the case before us to Judge

Lay's dissent in *Iowa Citizens for Environmental Quality, Inc. v. Volpe, supra.* In that dissent, we find the same argument that is well stated in this Court's opinion. But the Eighth Circuit held otherwise, and I prefer to cast my lot with the able opinion by Senior Judge Van Oosterhout when he wrote in that case, *Iowa Citizens* (at p. 854):

Section 102(2)(C) of NEPA requires a detailed statement of the environmental impact of a federal project by the responsible federal official. It does not specifically state how such official shall obtain the information upon which his statement is based. Since the enactment of NEPA, FHWA with the acquiescence of the Council on Environmental Quality, and the knowledge of Congress,[3] has consistently interpreted the provisions of NEPA as permitting the delegation of the physical act of gathering the information necessary for the preparation of Section 102(2)(C) EIS to the state highway departments recommending the proposed federal-aid highways.

[3] On June 16, 1971, Russell Train, Chairman of the Council on Environmental Quality, testified before the House Subcommittee on Investigation and Oversight and fully apprised this Subcommittee of FHWA's procedure of relying on state agencies for much of the information contained in environmental impact statements. Hearings on Red Tape Before the Subcommittee on Investigations and Oversight of the House Committee on Public Works, 92d Cong., 1st sess., pp. 261–263. See also Hearings Before the Subcommittee on Roads of the Senate Committee on Public Works, 91st Cong., 1st sess., p. 7 (August 25, 1970).

In my view, the Court today—by the adoption of the majority opinion—has overstepped its role in reviewing the acts of an administrative agency and has substituted its judgment for that of the Federal Highway Administration. In doing so, it joins the ranks of those who have engaged in an economic overkill that, like the adverse effect on the automobile industry, and the long delays in construction of the Alaska pipeline, will plague us for years to come.