M. Akifur RAHMAN, Niaz Anwar, Khalid Bhatti, Shimrote Ishaque, Oussama Jammal, Elie R. Khoury, Farideh Khoury, and Sammy U. Rehman, on behalf of themselves and all similarly situated persons; and Masooda Rahman and Riffat Mehmood, on behalf themselves and all similarly situated persons, Plaintiffs,

v.

Michael CHERTOFF, Secretary of the U.S. Department of Homeland Security, in his official capacity; Robert S. Mueller III, Director of the Federal Bureau of Investigation, in his official capacity, W. Ralph Basham, Commissioner of U.S. Customs and Border Protection, in his official capacity; and Julie L. Myers, Assistant Secretary of U.S. Immigration and Customs Enforcement, in her official capacity, Defendants.

No. 05 C 3761.

United States District Court, N.D. Illinois, Eastern Division.

July 26, 2007.

---

Afeef Law Offices Ltd., Hoffman Estates, IL, Aaron H. Caplan, ACLU of Washington, Seattle, WA, Kary L. Moss, Michael Jay Steinberg, American Civil Liberties Union Fund of Michigan, Detroit, MI, for Plaintiffs.

Anthony J. Coppolino, Andrea M. Gacki, J. Marcus Meeks, James J. Gilligan, Jeremy S. Brumbelow, United States Department of Justice, Washington, DC, AUSA, Thomas P. Walsh, United States Attorney's Office, Chicago, IL, for Defendants.

### MEMORANDUM OPINION AND ORDER

RONALD A. GUZMÁN, District Judge.

The named plaintiffs, on behalf of all others similarly situated, have sued various government officials seeking declaratory and injunctive relief because defendants' policies and practices, which purportedly cause repeated, lengthy and abusive border detentions of innocent U.S. citizens, allegedly violate their civil rights under the Fourth and Fifth Amendments. Before the Court is defendants' objection to Magistrate Judge Sidney I. Schenkier's Report and Recommendation ("R & R") in which he recommends that the Court certify two classes. Also before the Court is defendants' motion to dismiss the Second Amended Complaint pursuant to Federal Rule of Civil Procedure ("Rule") 12(b)(1) and (b)(6). For the following reasons, the Court rejects defendants' objections, adopts Magistrate Judge Schenkier's R & R in full, and grants in part and denies in part defendants' motion to dismiss.

### Facts

Plaintiffs are law-abiding U.S. citizens, who were either born or have lived in the U.S. for many years. (Second Am. Compl. ¶¶ 14–21.) They travel outside of the U.S. regularly for business and pleasure. (*Id.*) Each has been detained at least two times upon reentering the U.S. and some have been detained for over five hours.

Michael Chertoff is the Secretary of the Department of Homeland Security ("DHS"). (*Id.* ¶ 22.) Robert S. Mueller III is the Federal Bureau of Investigations ("FBI") Director. (*Id.* ¶ 23.) W. Ralph Basham is the Customs and Border Protection ("CBP")

Everett Joseph Cygal, Roger Pascal, Joshua Douglas Lee, Paula Marie Ketcham, Schiff Hardin LLP, Adam D. Schwartz, Harvey Michael Grossman, Wendy Sangbee Park, Roger Baldwin Foundation of ACLU, Inc., Linda Xochitl Tortolero, Conway & Mrowiec, Chicago, IL, Junaid Mustafa Afeef,

Commissioner. (*Id.* ¶ 24.) The CBP is a component of the DHS and responsible for protecting U.S. airports, seaports and land border crossings. (*Id.* ¶ 24.) Julie L. Myers is the Assistant Secretary of Immigration and Customs Enforcement ("ICE"). (*Id.* ¶ 25.) The ICE is a component of DHS, and has primary responsibility for investigating violations of our nation's customs and immigration laws. (*Id.*) All of these individuals are sued solely in their official capacity. (*Id.* ¶¶ 22–24.)

The Terrorist Screening Center ("TSC"), administered by the FBI, compiles the Terrorist Screening Database ("TSDB") (*Id.* ¶ 33.) The TSC includes in the TSDB, or watch list, all individuals that are believed by the federal government to have "any degree of terrorism nexus." (*Id.*) The TSDB allegedly includes more than 200,000 names, with each person being assigned a code to "depict the type of terrorist threat they purportedly present, and the manner in which they are to be treated by law enforcement officials." (*Id.* ¶¶ 3, 4.) The TSC makes the TSDB watch list available to federal, state and local law enforcement personnel nationwide. (*Id.* ¶ 34.) The TSC also provides a call-in center to assist such personnel in determining whether encountered individuals are on the TSDB list and if so, how law enforcement should respond. (*Id.* ¶ 36.) The DHS uses the TSDB watch list to screen U.S. citizens seeking reentry after travel abroad. (*Id.* ¶ 35.)

Plaintiffs allege that defendants have two principal policies that result in prolonged border detentions and cause improper treatment and conditions of confinement of members of the proposed classes. (*Id.* ¶ 39.) First, defendants act with deliberate indifference to plaintiffs' constitutional rights by knowingly over-classifying U.S. citizens by mischaracterizing the level of threat they pose to the U.S., *i.e.*, by stating that they pose a substantial threat or are armed and dangerous when they do not qualify for such a classification and failing to check whether information contained in the TSDB watch list is accurate or based on reliable information. (*Id.* ¶ 4.) Second, defendants act with deliberate indifference when they repeatedly misi-

dentify U.S. citizens whose names are similar to or the same as individuals on the TSDB watch list, as being someone on the TSDB watch list. (*Id.* ¶ 5.) Both policies exist because defendants do not have in place a system that ensures accurate classification and identification because the TSC is "plagued by poor management, flawed information technology systems, and a lack of operational protocols and policies." (*Id.* ¶ 40.) Further, these policies exist because the TSDB contains erroneous and inconsistent data within individual records and conflicting data among duplicate records. (*Id.*) These policies have the effect of prolonging and exacerbating detentions of overclassified or misidentified United States citizens and their families while reentering the country to the point of being nonroutine border searches. (*Id.*). Plaintiffs solely seek to enjoin defendants from continuing the alleged policies. (*Id.* ¶¶ 31–32.)

Plaintiffs seek certification of two classes: a "Primary Traveler Class" and a "Family Detainee Class." (*Id.* ¶¶ 27, 28.) The "Primary Traveler Class" includes: "All United States citizens who now are and/or in the future will be subjected to detentions upon reentry to the United States as a result of defendants' contested policies, practices and customs." The "Family Detainee Class" includes: "All persons who now are and/or in the future will be subjected to detention upon reentry to the United States as a result of defendants' contested policies, practices and customs and because they are a family member of and traveling with a member of the primary traveler class, (R & R 1–2, 22–23.)" On January, 17, 2007, Magistrate Judge Sidney I. Schenkier recommended certification of both classes. (*Id.* 22–23.)

### Discussion

Rule 72 provides for the referral of pretrial matters to a magistrate judge. Fed.R.Civ.P. 72. Under this rule, the magistrate's order may be subject to review by a district court judge. *See id.* However, a motion for class certification may not be decided independently by a federal magistrate judge. 28 U.S.C. § 636(b)(1)(A). Accordingly, the district court has the authority to make the final determination on the motion and must "make

a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1)(C).

Defendants argue that Magistrate Judge Schenkier incorrectly granted plaintiffs' motion for class certification based on four grounds. First, plaintiffs do not have standing in their own right, and thus they may not litigate as representatives of a class. (Defs.' Objections R & R 5.) Second, plaintiffs' classes are overbroad. (*Id.*) Third, plaintiffs have not properly satisfied Rule 23(a)'s numerosity requirement so as to make joinder impractical. (*Id.*) Fourth, plaintiffs' claims are not typical of the certified class because establishing that class members' Fourth Amendment rights were violated would require individualized determinations based on widely varying facts. (*Id.* 5–6.)

This Court is "mindful of the Supreme Court's directive to consider issues of class certification prior to issues of standing." *See Payton v. County of Kane,* 308 F.3d 673, 680 (7th Cir.2002) (citing *Ortiz v. Fibreboard Corp.,* 527 U.S. 815, 831, 119 S.Ct. 2295, 144 L.Ed.2d 715 (1999)); *see also* Fed.R.Civ.P. 23(c) ("As soon as practicable after the commencement of an action brought as a class action, the court shall determine by order whether it is to be so maintained."). Accordingly, the Court addresses the class certification issues first.

## I. Motion for Class Certification

Rule 23 governs class certification determinations. Fed.R.Civ.P. 23. "[A] determination of the propriety of class certification should not turn on likelihood of success on the merits." *Payton,* 308 F.3d at 677. If the party seeking class certification meets its burden of showing that the certification requirements are satisfied, the court must certify the proposed class. *Gen. Tel. Co. of Sw. v. Falcon,* 457 U.S. 147, 161, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982); *see Vickers v. Trainor,* 546 F.2d 739, 747 (7th Cir.1976). The court maintains broad discretion to determine whether a proposed class satisfies the

requirements and should err in favor of maintaining class actions. *King v. Kansas City S. Indus.,* 519 F.2d 20, 26 (7th Cir.1975); *see Patterson v. Gen. Motors Corp.,* 631 F.2d 476, 480 (7th Cir.1980).

■ "While there is nothing explicit in Rule 23 ..., many courts have held that there is a definiteness requirement implied in Rule 23(a)." *Alliance to End Repression v. Rochford,* 565 F.2d 975, 977 (7th Cir.1977). Thus, the class must be "sufficiently definite to permit ascertainment of the class members." *Id.*

As stated above, plaintiffs seek certification of two proposed classes. The "Primary Traveler Class" includes: "All United States citizens who now are and/or in the future will be subjected to detentions upon reentry to the United States as a result of defendants' contested policies, practices and customs." The "Family Detainee Class" includes: "All persons who now are and/or in the future will be subjected to detention upon reentry to the United States as a result of defendants' contested policies, practices and customs and because they are a family member of and traveling with a member of the primary traveler class." (R & R 1–2, 22–23.)

■ Defendants argue that the class definitions are fatally overbroad because the classes now include U.S. citizens who have been subject to border detentions of any kind. It is true that plaintiffs amended the class definitions to delete the word "unreasonable" as a descriptor of the detentions and now disavow basing their claims on any policy, practice or custom that would require an individual determination of liability as to each class member.[1] (Pls.' Reply Mem. Supp. Class Certification 12–13.) However, as the Court sees it, plaintiffs' theory is that when a U.S. citizen is overclassified on the watch list or misidentified as someone on the watch list, the U.S. citizen and his or her family members are automatically subject to unreasonable detention upon entry to the

---

1. The Court takes no position as to whether it was necessary to delete this phrase in order to pass muster under Rule 23.

U.S. in violation of the Fourth Amendment.[2] (*See* Pls.' Reply Mem. Supp. Class Certification 10–11.) This may end up being a tougher row to hoe for plaintiffs when it comes to establishing that once a U.S. citizen is subject to overclassification or misidentification, constitutional violations occur as a matter of course, but that is the path they have chosen.

Defendants also argue that the class definitions are overly broad because it is unclear whether the proposed class members have all suffered a constitutional violation. Given the Court's interpretation of plaintiffs' narrowed claims, the class includes only those who are subject to defendants' overclassification and misidentification policies which causes a *per se* unreasonable detention violative of the Fourth and Fifth Amendments.

Defendants also argue that membership in the class is too hypothetical or conjectural because it requires a merit-based inquiry into whether defendants' policies, practices and customs violate the U.S. citizens' Fourth and Fifth Amendment rights. Defendants' argument ignores other cases in which courts have certified Rule 23(b)(2) classes alleging violations of the Fourth and Fifth Amendments. *See, e.g., Alliance to End Repression*, 565 F.2d at 978 (affirming certification of Rule 23(b)(2) class alleging Chicago police practice of dossier collection, surveillance, harassment, physical and verbal coercion and summary punishment violated Fourth and Fifth Amendments); *Ill. Migrant Council v. Pilliod*, 540 F.2d 1062, 1065 (7th Cir.1976), *modified on other grounds*, 548 F.2d 715 (7th Cir.1977) (case in which court had certified class alleging INS' practice of searches and detentions violated Fourth and Fifth Amendments); *see LaDuke v. Nelson*, 762 F.2d 1318, 1324 (9th Cir.1985), *amended on other grounds*, 796 F.2d 309 (9th Cir.1986) (noting that certified class alleging INS border patrol's practice of searching migrant housing violated Fourth Amendment raised a justiciable case and controversy); *Anderson v. Cornejo*, 199 F.R.D. 228, 238 (N.D.Ill.2000) (certifying class alleging U.S. Customs' policy and practice of conducting nonroutine

searches violated the Fourth and Fifth Amendments). This also ignores those cases in which courts have certified classes that include members who will be subject to future violations of the Fourth Amendment. *See Alliance to End Repression*, 565 F.2d at 976 (affirming certification of class that included organizations that "hereafter may be ... subjected to or threatened by" practice sought to be enjoined); *Caroline C. ex rel. Carter v. Johnson*, 174 F.R.D. 452, 461 (D.Neb.1996) (listing cases in which courts have certified or affirmed the certification of classes that included persons who would be subjected to unlawful policies in the future); *Westefer v. Snyder*, Nos. 00–162–GPM, 00–708–GPM, 2006 WL 2639972, at *10 (S.D.Ill. Sept. 12, 2006) (same).

In support, defendants cite *Adashunas v. Negley*, 626 F.2d 600, 601–04 (7th Cir.1980), where the court held that a class defined as "all children within the State of Indiana entitled to a public education who have learning disabilities who are not properly identified and/or who are not receiving such special instruction as to guarantee them of minimally adequate education" was too diverse and unascertainable to be certified because a battery of tests was required to identify a learning disabled child and the level of their disability. However, the claims of the putative class in *Adashunas* challenged the state's failure to identify learning disabled children such that identification of each class member was essential to the claim and the relief sought. *See id.* The claims of the putative classes in the instant action challenge policies which defendants use to classify and identify all U.S. citizens seeking reentry to the U.S. such that it is unnecessary to identify each citizen affected. While defendants repeatedly emphasize the *consequences* of the policies, *e.g.,* unreasonable detention, plaintiffs have disavowed basing their claims on policies that would require any individualized determination of liability as to each class member. Rather, the putative classes seek to enjoin defendants' policies and practices of overclas-

---

**2.** The Court notes that at any time during the course of litigation, it has discretion to decertify the class. *Eggleston v. Chi. Journeymen Plumbers' Local Union No. 130,* 657 F.2d 890, 896 (7th Cir.1981) (stating that "[i]f the certification of the class is later deemed to be improvident, the court may decertify").

sifying and misidentifying U.S. citizens, which, if corrected, would eliminate the *per se* constitutional violations.

Defendants also rely on *Swain v. Brinegar*, 517 F.2d 766, 779–80 (7th Cir.1975). In *Swain*, where the plaintiffs sought to enjoin a particular proposed highway project, the court held that the class definition was over-inclusive because it included owners, tenants and users of farm land in Illinois who were not subject to having their land condemned for the proposed highway project. *Id.* In contrast to *Swain*, the class definition in this case includes only those U.S. citizens who are subject to defendants' contested policies of overclassification and misidentification that automatically lead to unreasonable detention.

In opposition to the motion for class certification, defendants also cited *Oshana v. Coca–Cola Bottling Co.*, 225 F.R.D. 575, 580 (N.D.Ill.2005), *aff'd*, 472 F.3d 506 (7th Cir. 2006). In *Oshana*, the named plaintiff sued Coca–Cola for damages pursuant to the Illinois Consumer Fraud Act for misrepresenting that fountain Diet Coke and canned/bottled Diet Coke were the same product although only fountain Diet Coke contained saccharin. *Id.* Pursuant to Rule 23(b)(1)(B) and/or 23(b)(3), plaintiff sought to certify a class defined as "[a]ll individuals who purchased for consumption and not resale fountain diet Coke in the State of Illinois from March 12, 1999, through the date of the entry of an order certifying the class." *Id.* at 578. The *Oshana* court held that "the proposed class definition is overly inclusive and encompasses millions of potential members without any identifiable basis for standing" because it included all purchasers and not only those who relied on defendant's misrepresentation. *Id.* at 580. The court further held that "[c]lass membership implies a state of mind element that requires an individual examination of each class member" because class members would be required to show they were misled or deceived. *Id.* at 581.

In contrast to the class definition in *Oshana*, the instant case is not one in which membership in the classes is dependent on a prospective member's state of mind. *See Gomez v. Ill. State Bd. of Educ.*, 117 F.R.D.

394, 397 (N.D.Ill.1987). The scope of the prospective class may be defined by reference to the defendant's conduct, *i.e.*, their policies, practices and customs in overclassifying or misidentifying persons via the watch list. *See Alliance to End Repression*, 565 F.2d at 978. To establish membership in either the Primary Traveler class or the Family Detainee class, one need only establish that he or she is a U.S. citizen or a family member of and traveling with the U.S. citizen, who has sought or will seek reentry to the U.S., and is either overclassified on the watch list or misidentified as being someone on the watch list.

Furthermore, in contrast to *Oshana*, the putative classes in the instant case seek solely a prospective injunction, relief that will inure to all class members rendering specificity of the class definition less critical. *See Westefer*, 2006 WL 2639972, at *10 ("[W]here class certification is sought under Rule 23(b)(2), precise definition [of the class] is not as important as it may be under other class certification rules, given that the relief sought is predominantly equitable relief against a defendant's allegedly unlawful conduct directed to the class as a whole." (quotation omitted)).

The Court finds *Alliance to End Repression v. Rochford*, 565 F.2d at 978, similar to the case at bar. In that case, the appellate court held that the district court did not abuse its discretion when it certified two classes, one of which consisted of:

> all residents of the City of Chicago, and all other persons who are physically present within the City of Chicago for regular or irregular periods of time, who engage or have engaged in lawful political, religious, educational or social activities and who, as a result of these activities, have been within the last five years, are now, or hereafter may be subjected to or threatened by alleged infiltration, physical or verbal coercion, photographic, electronic, or physical surveillance, summary punishment, harassment, or dossier collection, maintenance, and dissemination by defendants or their agents.

*Id.* at 976. The appellate court rejected defendants' argument that the classes were too

indefinite because they were defined by the activities of the defendants, *e.g.,* the pattern of allegedly unconstitutional harassment by the defendants. *Id.* at 978. As in *Alliance to End Repression,* the scope of the classes in the instant case is defined by the activities of the defendants, *e.g.,* the policies, practices and customs of unconstitutional detention by the defendants that allegedly violate the Fourth and Fifth Amendment rights of members of the classes.

For all of the reasons discussed, the Court finds the class definitions appropriately limited. Thus, the threshold definiteness requirement has been satisfied.

## A. Rule 23(a) Requirements

Rule 23(a) requires that:

(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed.R.Civ.P. 23(a). The moving party has the burden to establish that each of the prerequisites of Rule 23(a) are satisfied. *Gen. Tel. Co. of Sw,* 457 U.S. at 161, 102 S.Ct. 2364; *Valentino v. Howlett,* 528 F.2d 975, 979 (7th Cir.1976). If all of the elements of Rule 23(a) are satisfied, the moving party must also show that the action is maintainable under Rule 23(b)(1), (2), or (3). *Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 611–13, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997).

■ Defendants first argue that plaintiffs have not properly satisfied Rule 23(a)'s numerosity requirement. (Defs.' Objections R & R 5.) To do so, plaintiffs must show that the proposed classes are so numerous that joinder of all members is impracticable. Fed.R.Civ.P. 23(a). "[P]laintiffs are not required to specify the exact number of persons in the class, but cannot rely on conclusory allegations that joinder is impractical or on speculation as to the size of the class in order to prove numerosity." *Marcial v. Co-*

*ronet Ins. Co.,* 880 F.2d 954, 957 (7th Cir. 1989) (citations omitted). Plaintiffs may establish impracticability based on good faith estimates. *Young v. County of Cook,* No. 06 C 552, 2007 WL 1238920, at *2 (N.D.Ill. Apr.25, 2007). Further, whether joinder is impracticable depends on: "(1) the class size; (2) the geographic dispersion of class members; (3) the type of relief sought by the class; and (4) the practicability of relitigating a common core issue." *Radmanovich v. Combined Ins. Co. of Am.,* 216 F.R.D. 424, 431 (N.D.Ill.2003).

In support of numerosity, plaintiffs cite an audit report published by the U.S. Department of Justice that states that during the period of December 1, 2003 to January 23, 2005, 7,755 (or 42%) of the 18,447 total calls to the TSC did not match up with any name in the TSDB. (Mem. Supp. Mot. Class Certification, Ex. 2, Review of the Terrorist Screening Center, Audit Report 05–27 (June 2005).) Although the TSC receives calls from other agencies as well as Customs and Border Protection, calls from Customs and Border Protection account for 67% of the total calls. (*Id.*) Thus, even if only 67% of the 7,755 calls regarding misidentified persons concern reentry at the U.S. borders, that would amount to 5,165 people. Further, because 40% of people entering the U.S. are U.S. citizens, plaintiffs project that the number of U.S. citizens detained due to the contested misidentification policies, practices and customs is 2,066, which makes joinder impracticable.[3] Although the Court recognizes that merely because 40% of people entering the country are U.S. citizens does not necessarily mean that 40% of the misidentified persons are U.S. citizens, it would be unreasonable to assume that nearly all of the misidentified persons entering the country are not U.S. citizens. Thus, the Court holds that plaintiffs have established beyond mere speculation that the size of their putative classes is sufficiently large.

As for other considerations regarding impracticability of joinder, like the named

---

**3.** It is reasonable to infer from this conclusion that the size of the Family Detainee Class with regard to the misidentification policies, customs, and practices will be equal to, if not greater than, the size of the Primary Traveler Class.

plaintiffs, who live in Illinois, Massachusetts, New York, Washington, Michigan, and Wisconsin, the members of the proposed nationwide classes are geographically dispersed throughout the country. The classes seek declaratory and injunctive relief to prevent constitutional violations as to future plaintiffs, making joinder of those plaintiffs impossible. In addition, it would be highly impracticable to relitigate the common core issue of whether the overclassification and misidentification policies cause *per se* constitutional violations. In sum, given the data presented and after weighing all of the other considerations, the Court holds that plaintiffs have sufficiently established numerosity as to both classes.

Next, defendants argue that plaintiffs' claims are not typical of the certified class because establishing that class members' Fourth Amendment rights were violated would require individualized determinations based on widely varying facts. "A plaintiff's claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members and his or her claims are based on the same legal theory." *De La Fuente v. Stokely–Van Camp, Inc.,* 713 F.2d 225, 232 (7th Cir.1983) (quotation omitted).

Defendants argue that because there are factual variations as to border stops of U.S. citizens, typicality is lacking. As discussed above, plaintiffs now have disavowed basing their claims on any policy, practice or custom that would require an individual determination of liability as to each plaintiff. Thus, they allege that being either on the watch list or misidentified as someone on the watch list automatically triggers defendants' unconstitutional treatment of a class member when reentering the country, (*See* Pls.' Reply Mem. Supp. Class Certification 10 ("Defendants' written policies command ICE investigators to subject overclassified and misidentified citizens to substantial intrusions.").) Further, they seek solely injunctive and declaratory relief. Thus, the named plaintiffs' claims arise from the same practice or course of conduct that gives rise to the claims of other class members and their claims are based on the same legal theory. In sum, the Court finds that plaintiffs have established typicality.

## B. Rule 23(b)(2)

Plaintiffs in this case seek certification under Rule 23(b)(2), which requires them to establish that "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole." Fed. R.Civ.P. 23(b)(2). "Rule 23(b)(2) operates under the presumption that the interests of the class are cohesive and homogeneous such that the case will not depend on the adjudication of facts particular to any subset of the class nor require a remedy that differentiates materially among class members." *Lemon v. Int'l Union of Operating Eng'rs, Local No. 139,* 216 F.3d 577, 580 (7th Cir.2000). "The

need for, if not inevitability of, class-wide treatment when injunctive relief is at stake is what Rule 23(b)(2) is about." *Allen v. Int'l Truck & Engine Corp.*, 358 F.3d 469, 471 (7th Cir.2004).

Plaintiffs' allegations demonstrate their theory that defendants have acted on grounds generally applicable to Primary Traveler plaintiffs, who are overclassified on the watch list or misidentified as being someone on the watch list, and Family Detainee plaintiffs, who travel with a Primary Traveler plaintiff. When a Primary Traveler plaintiff is overclassified or misidentified, defendants' policies mandate officers and investigators to subject them and their family members who are also U.S. citizens, to substantial intrusion upon reentering the U.S. (*See* Pls.' Reply Mem. Supp. Class Certification 10–11.) The Court holds that these classes fall within the purview of Rule 23(b) (2).

"[A] federal court when asked to certify a nationwide class should take care to ensure that nationwide relief is indeed appropriate in the case before it, and that certification of such a class would not improperly interfere with the litigation of similar issues in other judicial districts." *Califano v. Yamasaki*, 442 U.S. 682, 702, 99 S.Ct. 2545, 61 L.Ed.2d 176 (1979). Defendants do not argue, and the Court does not find, that certification of the class will improperly interfere with litigation of similar issues in other judicial districts. Further, the Court has carefully considered defendants' objections to class certification and is confident that it is appropriate in this case. A nationwide class is not "inconsistent with principles of equity jurisprudence, since the scope of injunctive relief is dictated by *the extent of the violation established*, not by the geographical extent of the plaintiff class." *Id.* (emphasis added).[4]

Because the Court finds that the prerequisites for class certification have been satisfied, it rejects defendants' objections to Magistrate Judge Schenkier's ruling in which he recommended granting plaintiffs' motion for class certification and adopts that ruling in full. Accordingly, the Court proceeds to ad-

dress defendants' motion to dismiss the complaint.

## II. Motion to Dismiss for Lack of Jurisdiction

Defendants move to dismiss the complaint for lack of jurisdiction pursuant to Rule 12(b)(1). In ruling on a Rule 12(b)(1) motion to dismiss, the Court generally accepts as true all well-pleaded factual allegations of the complaint, drawing all reasonable inferences in plaintiff's favor. *Capitol Leasing Co. v. F.D.I.C*, 999 F.2d 188, 191 (7th Cir.1993) (per curiam). If, however, "a party properly raises a factual question concerning the [court's] jurisdiction .... [t]he district court may properly look beyond the jurisdictional allegations of the complaint and view whatever evidence has been submitted on the issue to determine whether in fact subject matter jurisdiction exists." *Grafon Corp. v. Hausermann*, 602 F.2d 781, 783 (7th Cir.1979) (footnote omitted).

First, defendants argue that plaintiffs lack standing because they have not alleged a real and immediate threat of harm and merely allege past instances of harm. Second, defendants argue that the plaintiffs' claims are nonjusticiable because the injunctive relief they seek would require excessive interference with the Executive Branch of government.

■ "Article III of the Constitution confines the federal courts to adjudicating actual cases and controversies." *Allen v. Wright*, 468 U.S. 737, 750, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984) (quotations omitted). "[T]he 'case or controversy' requirement defines with respect to the Judicial Branch the idea of separation of powers on which the federal Government is founded." *Id.* To establish standing, a plaintiff must demonstrate: (1) "an injury in fact, which is an invasion of a legally protected interest that is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical"; (2) "a causal relationship between the injury and the challenged conduct, such that the injury can be fairly traced to the

---

**4.** Of course, in the event that injunctive relief is awarded, it must be no more burdensome than

necessary to redress the constitutional violations. *See id.*

challenged action of the defendant and not from the independent action of some third party not before the court"; and (3) "a likelihood that the injury will be redressed by a favorable decision." *Perry v. Vill. of Arlington Heights,* 186 F.3d 826, 829 (7th Cir. 1999).

"[P]ast wrongs are evidence bearing on whether there is a real and immediate threat of repeated injury." *O'Shea v. Littleton,* 414 U.S. 488, 495, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974). Although past exposure to illegal conduct, in and of itself, does not show a present case or controversy, if it is accompanied by allegations of continuing adverse effects, the combination of allegations is sufficient to show a case or controversy regarding injunctive relief. *See id.* at 495–96, 94 S.Ct. 669.

■ An examination of the facts at hand show that each of the named plaintiffs has established actual and imminent injury in fact. The named plaintiffs have been repeatedly subjected to the defendants' alleged policies upon reentry at U.S. borders or their equivalent as a result of being misidentified or overclassified or traveling with a U.S. citizen so misidentified or overclassified. Plaintiffs allege the TSDB mandates that every law enforcement official approach every person listed on the TSDB watch list with caution, and none on the watch list is categorized as being low-threat. (Second Am. Compl. ¶ 39(a).) Thus, overclassified plaintiffs whose names are erroneously on the watch list and misidentified plaintiffs whose names are the Muslim or Arab equivalent of "John Smith" or similar to those on the watch list are categorized as a threat to the U.S. and thus detained for individual lengthy questioning. Each named plaintiff regularly travels outside of the U.S. for business, tourism or visitation of family and each plans to travel outside of the U.S. in the future. None of the plaintiffs have ever been involved in terrorism, terror-related activity or any other conduct that would provide legal justification for the severe treatment they received based on defendants' policies.

M. Akifur Rahman, a U.S. born citizen of Indian descent, was detained four times in 2004 and 2005, each detainment lasted approximately between 1.5 to 5.5 hours and one detainment involved a body search, seizure of his personal belongings and his being handcuffed to a chair for three hours. His wife, Masooda Rahman, a Canadian born citizen and permanent U.S. resident, and their children were detained while traveling with M. Akifur for over 5.5 hours. The Rahman family regularly travels to Canada to visit family.

Niaz Anwar, who became a U.S. citizen in 1985 and is married to a naturalized U.S. citizen, was detained nine times from 2004–06 and the detainments lasted approximately one to six hours, Anwar owns and operates a store that sells imported clothing and jewelry, which requires him to travel abroad to purchase merchandise. In addition, the Anwar family regularly travels to Canada to visit family.

Dr. Khalid Bhatti, a gastroenterologist who became a U.S. citizen in 1979 and is married to a naturalized U.S. citizen, was detained twice in 2004 and 2005 while traveling with his family, the detainments lasted between approximately 1.5 to 2.5 hours, and one of the detainments involved his being handcuffed and body searched. The Bhatti family regularly travels to Pakistan to visit family.

Shimrote Ishaque, a pharmacist who became a U.S. citizen in 1986 and is married to a naturalized U.S. citizen, was detained three times from 2004–2006, the detainments lasted between approximately 2 to 4 hours, and one of the detainments involved federal agents' pointing firearms at him (because the CBP computer system misidentified him as being armed and dangerous) and handcuffing him for over an hour. Ishaque regularly travels abroad to attend religious conferences and to visit relatives.

Oussama Jammal, an engineer who became a U.S. citizen in 2001 and is married to a naturalized U.S. citizen, was detained eleven times in 2002–05, the detainments lasted between approximately 2.5 to 4 hours, and the last detainment involved a body search. Jammal owns and operates a company that produces educational videos for clients including the U.S. Department of State, and

his work requires him to travel abroad regularly.

Dr. Elie R. Khoury, an obstetrician and gynecologist, who became a U.S. citizen with his wife Farideh in 1973, was detained seven times during the period of 2002–2005, the detentions lasted an average of 2 hours, and the detainments involved agents' conducting body searches of both Elie and Farideh, watching Elie as he urinated and photocopying documents that they were carrying. The Khourys regularly travel abroad for tourism.

Dr. Sammy U. Rehman, a radiologist, became a U.S. citizen in 1990 and is married to a naturalized citizen, was detained twice in 2005 and the last detainment involved numerous federal agents with their hands on their holstered firearms surrounding the car in which Rehman, his wife, Riffat Mehmood, and their three young sons were traveling because Rehman was misidentified by the computer system as being armed and dangerous. The Rehmans regularly travel to Pakistan and Canada to visit family.

Viewing the alleged facts, which are uncontradicted by defendants, as true for purposes of the Rule 12(b)(1) motion to dismiss, the Court cannot hold that the threat of unreasonable detainment is merely conjectural or hypothetical. Due to the frequency of the plaintiffs' travel outside of the U.S. and the fact that each has been detained on numerous occasions recently, the Court finds that there is a significant likelihood of their being detained in the future. The fact that plaintiffs have been subjected to lengthy detentions and questioning and have been cleared for entry on prior occasion(s) and yet continue to be similarly detained and questioned each and every time they reenter the U.S., bolsters the Court's conclusion.

For these reasons, the Court finds defendants' cited cases distinguishable. (*See* Defs.' Mem. Supp. Mot. Dismiss 9–14 (citing *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992); *City of Los Angeles v. Lyons,* 461 U.S. 95, 104, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983); *O'Shea,* 414 U.S. at 495–96, 94 S.Ct. 669; *Sierakowski v. Ryan,* 223 F.3d 440, 444–45

(7th Cir.2000); *Stewart v. McGinnis,* 5 F.3d 1031, 1038 (7th Cir.1993); *Knox v. McGinnis,* 998 F.2d 1405, 1414 (7th Cir.1993); *Robinson v. City of Chi.,* 868 F.2d 959, 966 (7th Cir. 1989))). Unlike the plaintiffs in *Lyons, Sierakowski, Knox,* and *Robinson,* who were each subjected to the policy sought to be enjoined on one isolated occasion, the plaintiffs in *Lujan* and *O'Shea,* who had never suffered any injury from the policy sought to be enjoined, and the plaintiff in *Stewart,* who failed to establish that the contested policy posed a sufficient threat of harm because he had suffered injury only twice out of the sixty times the policy could have been implemented, the instant named plaintiffs have been detained repeatedly for prolonged periods of time each time they have reentered the country and travel abroad regularly such that the likelihood of them being detained in a similar fashion is sufficient, The Court thus holds that the named plaintiffs have established the injury-in-fact element of standing.

Defendants' objections do not address the other two elements of standing, *i.e.,* cause and redressability. However, the Court finds that; (1) plaintiffs have sufficiently stated a causal connection between defendants' contested overclassification and misidentification policies and plaintiffs' injuries in that they argue that these policies automatically lead to unconstitutional detentions upon plaintiffs' reentry to the U.S. and (2) it is likely that plaintiffs' injuries may be redressed through a favorable decision.[5] Accordingly, the Court denies defendants' motion to dismiss for lack of subject matter jurisdiction on standing grounds.

Next, though they couch it in other terms, defendants argue that the case is nonjusticiable because it falls under the political question doctrine. The political question doctrine "rests primarily on the principle of separation of powers and the policy of judicial self-restraint." *Flynn v. Shultz,* 748 F.2d 1186, 1190 (7th Cir.1984). As the Supreme Court in *Baker v. Carr,* 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962), explained:

> Prominent on the surface of any case held to involve a political question is found [1] a textually demonstrable constitutional com-

---

**5.** As discussed below, the Court reserves ruling on justiciability at this time.

mitment of the issue to a coordinate political department; or [2] a lack of judicially discoverable and manageable standards for resolving it; or [3] the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or [4] the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or [5] an unusual need for unquestioning adherence to a political decision already made; or [6] the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

Unless one of these formulations is inextricable from the case at bar, there should be no dismissal for nonjusticiability on the ground of a political question's presence. The doctrine of which we treat is one of "political questions," not one of "political cases." The courts cannot reject as "no law suit" a bona fide controversy as to whether some action denominated "political" exceeds constitutional authority. The cases ... show the necessity for discriminating inquiry into the precise facts and posture of the particular case, and the impossibility of resolution by any semantic cataloguing.

*Id.* at 217, 82 S.Ct. 691.

Unlike a lack of federal jurisdiction that ends a case, nonjusticiability does not immediately foreclose any consideration of the matter. *Id.* at 198, 82 S.Ct. 691. Instead, "the Court's inquiry necessarily proceeds to the point of deciding whether the duty asserted can be judicially identified and its breach judicially determined, and whether protection for the right asserted can be judicially molded." *Id.*

Defendants argue that the complaint does not allege grounds for judicial supervision of their counter-terrorism efforts. Specifically, they contend that federal courts may not direct the operations of government agencies except as necessary to remedy deliberate and systematic violations of individuals' constitutional rights and the complaint does not state an adequate legal basis for the Court to revise and oversee the policies and practices by which defendants identify and investigate potential terrorist threats to national security.

Defendants cite *Rizzo v. Goode,* 423 U.S. 362, 365–78, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976), in support of their argument. In *Rizzo,* the Supreme Court noted that principles of equity and federalism caution against issuing an injunction against those in charge of an executive branch of an agency of state or local government except in rare situations. *Id.* at 379–80, 96 S.Ct. 598. However, *Rizzo* is distinguishable in that the Court had the benefit of factual findings regarding the precise parameters of the contested policies and procedures as well as the purported constitutional violations such that it could determine whether the case was justiciable. *See id.* at 364–65, 96 S.Ct. 598. The instant case is merely at the pleading stage and it is yet unknown whether there are deliberate and systematic violations of the class members' constitutional rights. As explained above, courts are permitted to proceed with caution to a point in the litigation when justiciability can be determined based on the nature of the purported violations and whether protection against such violations can be judicially molded.

Other cases on which defendants rely are also distinguishable. In *Gilligan v. Morgan,* in which a class comprised of students at Kent State University, in the wake of the tragedy that occurred there in May 1970, sought an injunction against the Governor of Ohio "to restrain him in the future from prematurely ordering National Guard troops to duty in civil disorders" and "to restrain leaders of the National Guard from future violation of the students' constitutional rights." 413 U.S. 1, 3, 93 S.Ct. 2440, 37 L.Ed.2d 407 (1973). During the pendency of the litigation, the National Guard changed its regulations, obviating the need for the Court to review them because the plaintiff class no longer contested the regulations in force. *Id.* at 11, 93 S.Ct. 2440. However, the class also sought continued surveillance over the training, weaponry and orders of the National Guard. *Id* at 6, 93 S.Ct. 2440. The Court held that claim to be nonjusticiable and advisory because the class merely sought to ensure that the National Guard enforced its

new regulations in the future. *Id.* at 10, 93 S.Ct. 2440. The Court noted that "it should be clear that we neither hold nor imply that the conduct of the National Guard is always beyond judicial review or that there may not be accountability in a judicial forum for violations of law for specific unlawful conduct by military person, whether by way of damages or injunctive relief." *Id.* at 11–12, 93 S.Ct. 2440.

*Laird v. Tatum,* 408 U.S. 1, 92 S.Ct. 2318, 33 L.Ed.2d 154 (1972), is another case in defendants' arsenal. In that case, the Court held that a class' complaints of a chilling effect on the exercise of First Amendment rights where such effect was not alleged to be caused by any specific action of the Department of the Army against the class, but by the mere existence and operation of the Army's investigative and data-gathering system, were not justiciable. *Id.* at 3, 11, 92 S.Ct. 2318. The Court held that it was not the role of the judiciary to "monitor[ ] ... the wisdom and soundness of Executive action ... absent actual present or immediately threatened injury resulting from unlawful governmental action." *Id.* at 15, 92 S.Ct. 2318.

Defendants also cite *Allen v. Wright,* 468 U.S. at 754–56, 104 S.Ct. 3315, in which a class of parents of black children attending public schools in districts undergoing desegregation sued the IRS for its failure to adopt adequate standards to deny tax-exempt status to racially discriminatory private schools, which harmed the class by either failing to avoid a violation of law or creating stigmatic injury. The *Allen* Court held that because the class did not seek "to enforce specific legal obligations whose violation works a direct harm, but to seek a restructuring of the apparatus established by the Executive Branch to fulfill its legal duties," the separation of powers doctrine precluded equitable relief. *Id.* at 760–61, 104 S.Ct. 3315.

In contrast to *Gilligan, Laird,* and *Allen,* the instant case presents actual or threatened injuries, or direct harm, due to defendants' alleged unconstitutional activity in the context of a concrete set of facts. As noted in Justice Blackmun's concurrence in *Gilligan,* "an evaluation ... in the context of a particular factual setting as a predicate to relief in the form of an injunction against continuing activity or for damages would present wholly different issues." 413 U.S. at 14, 93 S.Ct. 2440. Further, as emphasized in the majority opinion in *Laird,* "there is nothing in our Nation's history or in this Court's decided cases, including our holding today, that can properly be seen as giving any indication that actual or threatened injury by reason of unlawful activities of the military would go unnoticed or unremedied." 408 U.S. at 11, 92 S.Ct. 2318.

Finding defendants' cases distinguishable, the Court, however, notes that it proceeds with extreme caution, fully aware that "[a]ny rule of constitutional law that would inhibit the flexibility of the political branches of government to respond to changing world conditions should be adopted only with the greatest caution." *Mathews v. Diaz,* 426 U.S. 67, 81, 96 S.Ct. 1883, 48 L.Ed.2d 478 (1976). "[W]hile individual rights are protected carefully, it is within a framework that takes account of the broad substantive power of other branches, and it is clear that respect for the political branches affects but does not preclude, decision on the merits." *Flynn,* 748 F.2d at 1191 (quotations omitted); *see Hamdi v. Rumsfeld,* 542 U.S. 507, 535, 124 S.Ct. 2633, 159 L.Ed.2d 578 (2004) (rejecting argument that separation of powers precluded courts from inquiring into the factual basis of an enemy combatant designation by U.S. military authorities). The Court thus reserves ruling on the justiciability issue at this time and proceeds cautiously to the merits of defendants' motion to dismiss for failure to state a claim.

### III. Motion to Dismiss for Failure to State a Claim

On a motion to dismiss under Rule 12(b)(6), "all factual allegations in the complaint" are accepted as true, and all reasonable inferences from the facts are weighed in plaintiff's favor. *Murphy v. Walker,* 51 F.3d 714, 717 (7th Cir.1995). The complaint will be dismissed only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–

46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). In addition, the Court will construe the complaint liberally and will view the allegations in a light most favorable to the non-moving party. *Caremark, Inc. v. Coram Healthcare Corp.*, 113 F.3d 645, 648 (7th Cir.1997).

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated ...." U.S. CONST. amend. IV. "The touchstone of Fourth Amendment analysis is whether a person has a 'constitutionally protected reasonable expectation of privacy.'" *Cal. v. Ciraolo*, 476 U.S. 207, 211, 106 S.Ct. 1809, 90 L.Ed.2d 210 (1986) (quoting *Katz v. United States*, 389 U.S. 347, 360, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967) (Harlan, J., concurring)).

"It is axiomatic that the United States, as sovereign, has the inherent authority to protect, and a paramount interest in protecting, its territorial integrity." *United States v. Flores–Montano*, 541 U.S. 149, 153, 124 S.Ct. 1582, 158 L.Ed.2d 311 (2004). "The Government's interest in preventing the entry of unwanted persons and effects is at its zenith at the international border." *Id.* at 152, 124 S.Ct. 1582. Accordingly, "the Fourth Amendment's balance of reasonableness is qualitatively different at the international border than in the interior." *United States v. Montoya de Hernandez*, 473 U.S. 531, 538, 105 S.Ct. 3304, 87 L.Ed.2d 381 (1985). Thus, the Supreme Court has stated "[t]ime and again ... that 'searches made at the border, pursuant to the longstanding right of the sovereign to protect itself by stopping and examining persons and property crossing into this country, are reasonable simply by virtue of the fact that they occur at the border.'" *Flores–Montano*, 541 U.S. at 152–53, 124 S.Ct. 1582 (quoting *United States v. Ramsey*, 431 U.S. 606, 616, 97 S.Ct. 1972, 52 L.Ed.2d 617 (1977)). This is so because "not only is the expectation of privacy less at the border than in the interior, the Fourth Amendment balance between the interests of the Government and the privacy right of the individual is also struck much more favorably to the Government at the border." *Montoya de Hernandez*, 473 U.S. at 539, 105 S.Ct. 3304 (citations omitted).

"Routine searches of the persons and effects of entrants are not subject to any requirement of reasonable suspicion, probable cause, or warrant ...." *Id.* at 538, 105 S.Ct. 3304. "Routine border inspections are those that do not pose a serious invasion of privacy and that do not embarrass or offend the average traveler." *United States v. Johnson*, 991 F.2d 1287, 1291 (7th Cir.1993). For example, "[a]utomotive travelers may be stopped at fixed checkpoints near the border without individualized suspicion even if the stop is based largely on ethnicity ...." *Montoya de Hernandez*, 473 U.S. at 538, 105 S.Ct. 3304 (citing *United States v. Martinez–Fuerte*, 428 U.S. 543, 562–63, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976)). "A search at the border of a traveler's luggage and personal effects is routine. The search of a border entrant's suitcase, purse, wallet, and overcoat simply is not sufficiently intrusive to be considered nonroutine." *Johnson*, 991 F.2d at 1291–92. "[A] perusal of documents or letters to identify the nature of the documents and to verify that they contain no contraband or dutiable items would clearly fall within a routine border search since such an intrusion is minimal." *United States v. Soto–Teran*, 44 F.Supp.2d 185, 191 (E.D.N.Y.1996) (stating, however that "once a search of a sealed envelope or package reveals no contraband or dutiable items, a close reading of the contents of documents could intrude on a person's privacy since such documents could deal with very personal matters, such as a diary or desk calendar").

The Supreme Court has noted that a border search is not routine if it involves a strip, body cavity, or involuntary x-ray search, but it has reserved ruling on the level of suspicion required under those circumstances and has remained silent on the issue of pat-down searches. *Montoya de Hernandez*, 473 U.S. at 541 n. 4, 105 S.Ct. 3304; *see United States v. Dorsey*, 641 F.2d 1213, 1218 (7th Cir.1981) (requiring reasonable suspicion for pat-down searches); *see also Kaniff v. United States*, 351 F.3d 780, 785 (2003) (declining to reconsider *Dorsey*, post-*Montoya de Hernandez*). With regard to an alimentary canal search,

the Court has held that "detention of a traveler at the border, beyond the scope of a routine customs search and inspection, is justified at its inception if customs agents, considering all the facts surrounding the traveler and her trip, reasonably suspect that the traveler is smuggling contraband in her alimentary canal." *Montoya de Hernandez,* 473 U.S. at 541, 105 S.Ct. 3304. In addition, courts have required reasonable suspicion prior to a close reading and photocopying of a border entrant's documents. *See United States v. Fortna,* 796 F.2d 724, 738–39 (5th Cir.1986) (holding photocopying of documents found in border entrant's carry-on bag was permissible because documents raised suspicion of illegal conduct); *United States v. Schoor,* 597 F.2d 1303, 1306 (9th Cir.1979) (holding documents properly seized by custom officials based on notification that they were instrumentalities of narcotics crime); *Soto–Teran,* 44 F.Supp.2d at 191 (applying reasonable suspicion standard to determine lawfulness of border officials' closely reading and photocopying documents).

The classes, as stated above, allege that defendants' overclassification and misidentification policies are based on a record keeping system that has no mechanism to ensure its accuracy and that the policies mandate nonroutine border detentions. Thus, the classes allege that they are subject to nonroutine border detentions, including but not limited to pat-down body searches, handcuffing, photocopying of documents, and being detained and held at gunpoint, without any reasonable suspicion. Whether they will be able to prove that the policies are based on an illogical record keeping system and mandate repetitive nonroutine border detentions is a different matter and one not appropriate at this stage in the litigation. Accepting the classes' version of the facts as true, the Court holds that their allegations are sufficient to put defendants on notice of the classes' Fourth Amendment claims.

■ With regard to the class' Fifth Amendment claims, defendants argue that: (1) the classes' substantive due process claim fails because they have not alleged that they have been prevented from traveling internationally and (2) the classes' procedural due process claim fails as a matter of law because the classes have failed to allege that CBP officers ever told other travelers their reasons for detaining plaintiffs and because the classes have not alleged an alteration of their legal status, above and beyond mere defamation, to satisfy the "stigma plus" standard.

"[T]he 'right' of international travel has been considered to be no more than an aspect of the 'liberty' protected by the Due Process Clause of the Fifth Amendment." *Califano v. Torres,* 435 U.S. 1, 4 n. 6, 98 S.Ct. 906, 55 L.Ed.2d 65 (1978). Thus, the right "can be regulated within the bounds of due process." *Id.* Courts "do not apply strict scrutiny to restrictions on international travel rights that do not implicate First Amendment concerns." *Eunique v. Powell,* 302 F.3d 971, 973 (9th Cir.2002). Accordingly, a "seizure and temporary detention ... would be violative of substantive due process only if it were 'wholly irrational.'" *Duncan v. Goedeke,* 837 F.Supp. 846, 850 (S.D.Tex.1993) (quoting *Califano v. Aznavorian,* 439 U.S. 170, 177, 99 S.Ct. 471, 58 L.Ed.2d 435 (1978)).

Defendants first argue that the classes have not adequately alleged that their right to travel internationally has been violated. Defendants argue that short of denying a passport, international travel is not burdened. This Court disagrees.

In *Califano v. Aznavorian,* a class of Supplementary Social Security Income recipients alleged that a provision of the Social Security Act, which barred payment of benefits during any month that the recipient spent entirely outside of the United States, imposed a burden on their freedom of international travel in violation of the Fifth Amendment. 439 U.S. at 172–73, 99 S.Ct. 471. The *Califano* Court held that unless the contested governmental action is "wholly irrational, it is constitutional in spite of its incidental effect on international travel." *Id.* at 177, 99 S.Ct. 471. *Califano* appears to have left the door open for challenges such as the instant one. Some class members have been detained seven to nine times within a three-year period such that it can be said that the right to international travel has been incidentally effected. Further, the classes allege that defendants' overclassification and misidentifica-

tion policies that mandate nonroutine border detentions of U.S. citizens are caused by defendants' irrational record keeping system. Accordingly, the Court holds that the complaint sufficiently states a substantive due process claim based on the right of international travel.

 Next, defendants argue that the classes' procedural due process claim fails as a matter of law. To state a procedural due process claim, a plaintiff must allege a deprivation of a constitutionally protected liberty or property interest and a denial of adequate procedural protections. *See Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 428, 102 S.Ct. 1148, 71 L.Ed.2d 265 (1982).

The classes allege that they are deprived of a liberty interest in their reputation because they are "single[d] out ... as security threats in full view of other travelers." (*See* Pls.' Resp. Defs.' Mot. Dismiss 30.) "To be constitutionally cognizable, however, ... defamation must consist of specific stigmatizing statements that are made public." *Wroblewski v. City of Washburn*, 965 F.2d 452, 456 (7th Cir.1992); *see Ratliff v. City of Milwaukee*, 795 F.2d 612, 626–27 (7th Cir.1986) ("In a common law defamation action, any publication of false and defamatory material might be sufficient, but in the context of the liberty interest protected by the Fourteenth Amendment, [plaintiff] was required to show broader publication.").

The Court finds no allegation of specific stigmatizing statements that have been made public in the complaint. Merely "being singled out" at the border does not sufficiently state a procedural due process claim. Plaintiffs have not alleged that any other traveler has been made privy to any information in the watch list database or the reasons for plaintiffs' detention. Accordingly, the Court agrees with defendants that the classes fail to state a procedural due process claim.[6]

### Conclusion

For the foregoing reasons, the Court rejects defendants' objections to Magistrate Judge Schenkier's R & R in which he recommended certification of the Primary Traveler

Class and the Family Detainee Class, and the Court adopts the R & R in full. The Court grants in part and denies in part defendants' motion to dismiss [doc. no. 118]. The Court grants the motion with respect to the classes' procedural due process claim, which is dismissed without prejudice. In all other respects, defendants' motion to dismiss is denied.

**SO ORDERED.**

### *REPORT AND RECOMMENDATION*

SCHENKIER, United States Magistrate Judge.

Ten named plaintiffs have filed this suit seeking declaratory and injunctive relief, alleging that defendants' policies, practices, and customs related to the screening of U.S. citizens and their families upon reentering the United States after international travel violate their civil rights under the Fourth and Fifth Amendments. The plaintiffs now seek certification of two plaintiff classes pursuant to Federal Rules of Civil Procedure ("Rule") 23(a) and 23(b)(2) (doc. # 99). By order dated June 27, 2006, the district court referred the present motion for class certification to this Court for a Report and Recommendation (doc. # 102).

For the reasons set forth below, the Court recommends that two plaintiff classes be certified using the following two definitions:

#### (1) The Primary Traveler Class

All United States citizens who now are and/or in the future will be subjected to detentions upon reentry to the United States as a result of defendants' contested policies, practices and customs.

#### (2) The Family Detainee Class

All persons who now are and/or in the future will be subjected to detention upon reentry to the United States as a result of defendants' contested policies, practices and customs and because they are a family member of and traveling with a member of the primary traveler class.

---

**6.** Because the Court finds that the classes' have failed to allege that specific defamatory state-

ments were made public, the Court need not reach any other issues raised by defendants.

## I.

The legal standards governing class certification motions are well-established. To be certified, a proposed class must (1) be "sufficiently definite to permit ascertainment of the class members," *Alliance to End Repression v. Rochford*, 565 F.2d 975, 977 (7th Cir.1977); (2) meet the four prerequisites of Rule 23(a); and (3) satisfy one of the conditions of Rule 23(b). If these requirements are met, the district court has broad discretion to determine whether certification is appropriate in a particular case. *Retired Chicago Police Assoc. v. City of Chicago*, 7 F.3d 584, 596 (7th Cir.1993) (hereinafter "RCPA"). The party seeking certification bears the burden of demonstrating that certification is appropriate. *Id.* Additionally, the decision to certify should consider the effects on the cost and efficiency of litigation since those objectives are the primary purpose of the class action procedure. *Rosario v. Cook County*, 101 F.R.D. 659, 661 (N.D.Ill.1983).

Under Rule 23(a), a class may be certified "only if (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims ... of the representative parties are typical of the claims ... of the class, and (4) the representative parties will fairly and adequately protect the interests of the class." Rule 23(b)(2) permits certification if "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole." This "rule is devoted primarily to civil rights class actions which allege violations of constitutional rights." *Alliance*, 565 F.2d at 979 n. 9.

## II.

We draw the following factual background from the second amended class action complaint.[1] The Terrorist Screening Center ("TSC") is a unit of the federal government administered by the FBI, which compiles the Terrorist Screening Database ("TSDB") (Compl.¶ 12). The TSDB is the federal "watch list" of all individuals believed to have "any degree of terrorism nexus" and currently contains more than 200,000 names (*Id.*). The TSC makes the TSDB available to federal, state, and local law enforcement personnel and provides a 24/7 call-in center to assist screening encountered individuals (*Id.* at ¶¶ 12–13). The Department of Homeland Security ("DHS") uses information from the TSDB to screen United States citizens seeking to reenter the country after travel abroad (*Id.* at ¶ 12).

Utilization of the TSDB results in two allegedly important errors which plaintiffs allege adversely affect many innocent U.S. citizens. *First*, the TSDB allegedly *over-classifies* certain citizens by erroneously indicating that they pose a threat to law enforcement officials or national security (Compl. at ¶ 13). *Second*, use of the TSDB allegedly leads to *misidentification* of citizens who, though not on the watch list, are identified as being on the watch list because their names are the same or similar to others listed in the TSDB (*Id.* at ¶ 14). The TSDB is also allegedly plagued by problems of poor management, inaccurate data and support systems, and conflicting information that confuses law informant officials (*Id.* at ¶¶ 14–15).

According to plaintiffs, the defendants have authority over the policies, practices, and customs related to the TSDB and reentry of citizens into the United States (Compl. at ¶ 15). In this capacity, plaintiffs say that defendants have adopted policies which:

(A) fail to ensure reasonably expeditious reentry for misidentified citizens;

(B) fail to properly classify over-classified citizens and fail to ensure those individuals are not unreasonably detained

1. Defendants have not answered this pleading, but instead have moved to dismiss it. Discovery is at a very preliminary stage. A court must "accept the allegations in the complaint as true ..." in the absence of countervailing proof. Here, defendant offers no evidence that would challenge the general principle that we accept the factual allegations proffered by plaintiffs to determine the certification question. *See, e.g., Rahim v. Sheahan*, 2001 WL 1263493, *11 (N.D.Ill.2001) (accepting plaintiffs' allegations regarding the broad application of the challenged policies to *all* hospitalized inmates, in the absence of contrary evidence).

or subjected to mistreatment at the border;

(C) grant unfettered discretion to federal agents to improperly prolong detentions of misidentified and over-classified citizens;

(D) fail to adequately train, supervise, and discipline federal agents in the exercise of their discretion to detain and search misidentified and over-classified citizens upon reentry (*Id.* at 15–16); and

(E) fail to ensure reasonable conditions of treatment and confinement for family members traveling with misidentified or over-classified citizens who are detained upon reentry.

(*Id* at 15–16).

The plaintiffs allege that these policies directly caused injuries to the named plaintiffs and their families. Eight named plaintiffs are U.S. citizens of South Asian or Middle Eastern descent who regularly travel internationally for lawful purposes, such as business trips and family visits, frequently accompanied by their families (Compl. at ¶ 3). These plaintiffs allege that none of them have engaged in terrorism or terror-related activities (*Id.*). But, when they re-enter the country from abroad, they have been repeatedly detained for periods as long as five to six hours by Customs and Border Patrol employees (*Id.* at ¶ 4). Two of the plaintiffs have been detained more than nine times in recent years (*Id*). These detentions have occurred at airports across the country and at land crossings along the northern border (*Id.*).

While the specifics of the detentions alleged by these plaintiffs vary, these plaintiffs allege that the detentions are always humiliating and often terrifying (Compl. at ¶ 4). Plaintiffs specifically allege that: six of the plaintiffs have been subjected to body searches; three have been handcuffed; one was shackled for three hours; and one was held at gun point (*Id.* at 4–5). Plaintiffs further allege that these detentions have also included extensive questioning, seizure and examination of personal papers and items, fingerprinting and photographing, and the use of light force on at least one occasion (*Id.*).

Plaintiffs assert that the members of the proposed class frequently travel with family members including young children and an elderly parent (Compl. at ¶ 6). When they do, plaintiffs allege that the family members have also been detained and are often confined without access to religiously appropriate food, recreational facilities, sanitary waiting areas and bathrooms (*Id.*). Two additional named plaintiffs are the wives of the plaintiffs described above, who allegedly have been subjected to these detention conditions (*Id.*). As a result of these alleged detentions, plaintiffs state that they each sustained physical, mental, and emotional distress and were wrongfully stigmatized as a security risk (*Id.* at ¶ 28).

Based on the allegations in the complaint, plaintiffs assert six causes of action under the Fourth and Fifteenth Amendments: (1) a Fourth Amendment right to be free from repeated seizures of excessive duration; (2) a Fourth Amendment right to be free from unreasonable seizures; (3) a Fourth Amendment right to be free from excessive force and restraint; (4) a Fifth Amendment right to international travel: (5) a Fifth Amendment right not to be deprived of property without due process of law; and (6) a Fourth and Fifth Amendment right to be free from unreasonable conditions of confinement (Compl. at ¶¶ 29–31). The plaintiffs seek a declaratory judgment that defendants' identified policies, practices, and customs violate their Fourth and Fifth Amendment rights, and those of others similarly situated, and an injunction against defendants to remedy these violations (*Id.* at 31–32).

In their opening brief, the plaintiffs identified the two classes they wished to certify:

**(1) Primary Traveler Class:**

All United States citizens who now are and/or in the future will be subjected to unreasonable detention and treatment upon reentry to the United States by DHS and/or FBI officials as a result of defen-

dant's challenged policies, practices, and customs.

(Pl.'s Mem. at 4); and

**(2) Family Detainee Class:**

All persons who now are and/or in the future will be unreasonably detained upon reentry to the United States because they are a family member of and traveling with a member of the primary traveler class.

(Pl.'s Mem. at 5). In the reply, plaintiffs modified their proposed class definitions as follows:

**(1) Primary Traveler Class:**

All United States citizens who now are and/or will be subjected to detentions upon reentry to the United States as a result of defendants' contested policies, practices and customs.

(Pl.'s Reply Mem. at 2); and

**(2) Family Detainee Class:**

All persons who now are and/or in the future will be subjected to detention upon reentry to the United States as a result of defendants' contested policies, practices and customs, and because they are a family member of and traveling with a member of the primary traveler class.

(Pl.'s Reply Mem. at 3–4).

Plaintiffs argue that each modified class is sufficiently definite, satisfies the four prerequisites of Rule 23(a), and meets the conditions of Rule 23(b)(2). For their part, defendants counter that none of these requirements is met.[2] Specifically, defendants claim that: (1) the classes are not adequately defined because membership is not ascertainable; (2) three of the Rule 23(a) prerequisites (numerosity, typicality, and commonality) are not met; and (3) the Rule 23(b)(2) conditions are not satisfied. For the reasons set forth below, the Court accepts the plaintiffs' proposed class definitions as we have modified them. Nonetheless, we will address each of defendants' arguments in turn.

**III.**

We begin with the threshold question of whether the proposed classes are sufficiently definite to permit certification. Defendants argue that because plaintiffs originally proposed classes that defined membership in terms of "unreasonable" detention and/or treatment, the proposed classes are impermissibly indefinite, as the reasonableness of any alleged detention or treatment (and, thus, membership in the proposed classes) can only be determined on a case-by-case basis (Defs.' Mem. at 4–5). However, in their reply, plaintiffs have modified their proposed class definitions to eliminate any reference to the "reasonableness" of any particular detention or treatment; rather, they now define their proposed classes by reference to whether individuals are subject to detention as a result of defendants' challenged policies, practices and customs (in the primary traveler class), and additionally, because they are a family member of and traveling with a member of the primary traveler class (for the family detainee class). We believe that these modified class definitions overcome any challenge to the definiteness of the class.

For nearly 30 years, case law within this circuit has made clear that "a class that satisfies all of the other requirements of Rule 23 will not be rejected as indefinite when its contours are defined by the defendants' own conduct." *Alliance*, 565 F.2d at 978. In *Alliance*, the Seventh Circuit affirmed certification of a class of persons who, as a result of their lawful first amendment activities, were subjected to an "alleged pattern of unconstitutional harassment by the defendants," which allegedly included infiltration, coercion, electronic or physical surveillance, harassment, and dossier maintenance and dissemination. The *Alliance* court rejected the argument that the class was not sufficiently ascertainable, explaining that class membership was defined by reference to the defendants' alleged conduct. *Alliance*, 565

---

**2.** As a threshold matter, defendants also argue that the class cannot be certified because plaintiffs lack standing to seek the prospective injunctive relief on their own behalf, and therefore may not litigate on behalf of a class (Defs.' Mem. at

2). This argument, however, is primarily articulated in a separately pending motion to dismiss that is pending before Judge Guzman. Therefore, the standing issue is not addressed in this report and recommendation.

F.2d at 978. *See also Wallace v. Chicago Housing Authority,* 224 F.R.D. 420, 425 (N.D.Ill.2004) ("the scope of the prospective class may be defined, for example, by reference to the defendants' conduct"); *Rahim v. Sheahan,* 2001 WL 1263493, *11 (N.D.Ill. October 19, 2001) (certifying a class of inmates "subject to defendants' alleged policies regarding hospitalized detainees"); *Hispanics United v. Village of Addison,* 160 F.R.D. 681, 685 (N.D.Ill.1995) (certifying and finding sufficiently definite a class of plaintiffs defined as those who had been or would be adversely affected by the acts, polices and practices of defendants and their agents).

Moreover, in considering whether the proposed classes are sufficiently definite, we find it significant that the plaintiffs seek class certification under Rule 23(b)(2), and request only declaratory and injunctive relief concerning the alleged unconstitutional practices, policies and customs that give rise to the detentions. Plaintiffs seek no class-wide monetary relief that would require identification of each person subject to the allegedly unconstitutional policies, practices or customs. Rather, plaintiffs seek class relief based on (to use the words of Rule 23(b)(2)) "grounds generally applicable to the class": the allegedly unconstitutional policies, practices and customs. If plaintiffs establish the unconstitutionality of those policies, practices and customs, they seek (again, to quote Rule 23(b)(2)) "final injunctive relief or corresponding declaratory relief with respect to the class as a whole." No identification of specific individual class members is required for purposes of giving notice so that they may have an opportunity to opt out, since class members in a Rule 23(b)(2) class do not have opt-out rights. Nor do plaintiffs seek any other relief that would require identification of the specific persons—by name—who are subject to the allegedly unconstitutional policies, practices or customs.

We have considered the arguments and authorities offered by defendants to suggest that the proposed classes are too indefinite to certify. In light of the amended class definitions, we do not find those arguments persuasive.

*First,* a number of the cases cited by defendants recognize that a class definition contingent on the "state of mind of the perspective class members" may be too indefinite to permit certification. *Alliance,* 565 F.2d at 978. *See also Simer v. Rios,* 661 F.2d 655, 669 (7th Cir.1981) (affirming denial or certification where the proposed class was defined as individuals "who were discouraged" from taking a certain action); *Harris v. Gen. Dev. Corp.,* 127 F.R.D. 655, 659 (N.D.Ill.1989) (same); *Oshana v. Coca–Cola Co.,* 225 F.R.D. 575, 581 (N.D.Ill.2005) (denying certification because "membership implie[d] a state of mind element" that individuals were deceived), *aff'd,* 472 F.3d 506 (7th Cir.2006). However, as proffered by plaintiffs, the classes do not turn on the state of mind of putative class members, but rather are defined by the challenged conduct of the defendants in allegedly maintaining certain policies, practices and customs.

*Second,* we are not persuaded by defendants' reliance on *Crosby v. Social Security Administration,* 796 F.2d 576 (1st Cir.1986). In *Crosby,* plaintiffs sought certification of a class consisting of claimants for disability benefits "who have not had a hearing held within a reasonable time and/or who have not had a decision rendered in such a hearing for benefits within a reasonable time from the date of Request of Hearing." 796 F.2d at 578. The appeals court affirmed the district court's denial of certification of this proposed class. The appeals court noted that under governing supreme court precedent (*Heckler v. Day,* 467 U.S. 104, 104 S.Ct. 2249, 81 L.Ed.2d 88 (1984)), "the determination of whether the right to a reasonably timely ALJ hearing and decision has been violated can be made only on a case-by-case basis." *Crosby,* 796 F.2d at 580. The appeals court reasoned that the proposed class was too indefinite to certify, because the question of whether any particular claimant received a reasonably timely ALJ hearing or decision required individual fact finding and litigation. *Id.*

However, in this case, both the proposed classes and the relief sought are materially different than was the case in *Crosby.* As for class definition, in *Crosby* the plaintiffs attempted to define the class by reference to

those claimants who had not had hearings held or decisions rendered within a reasonable time; there is no indication that plaintiffs sought to define a putative *Crosby* class by reference to any policies, practices or customs the Secretary maintained for determining the timing of hearings and decisions. By contrast, in this case, plaintiffs' proposed classes are defined by reference to defendants' challenged policies, practices and customs. Class membership turns on whether persons are subject to those challenged policies, practices and customs, and not on the particular experience of any specific class member may have had under those policies, practices and customs. As to the relief sought, in *Crosby* plaintiffs sought injunctive relief that required claimants to be sent notice of *class members* concerning their rights. *Crosby*, 796 F.2d at 579. Sending that proposed notice would have required identification of particular class members, which, in turn, would have required determination of each putative claimant who had not received a hearing or determination within a "reasonable time." In this case, plaintiffs do not seek any kind of similar individualized relief for the putative class members.[3]

*Third*, defendants claim that the need for mini-trials and individual determinations of whether particular putative class members were unreasonably detained would create a substantial administrative burden on the Court that renders class certification inappropriate (Defs.' Mem. at 6–7). To be sure, the feasibility of administering a class action is always a relevant consideration. *Simer*,

661 F.2d at 669 n. 24. However, that consideration diminishes in importance in a case where, as here, plaintiffs seek neither monetary relief nor any equitable relief that would require identification of or adjudications for specific putative class members. Indeed, the cases upon which defendants rely for their "administrative feasibility" argument all involved cases where some form of monetary relief was sought for the putative class. *See Simer*, 661 F.2d at 669 (the final form of relief, even though characterized as declaratory and injunctive, would be "monetary in nature"); *Fournigault v. Independence One Mortgage Corp.*, 234 F.R.D. 641, 646 (N.D.Ill. 2006) (seeking certification under Rule 23(b)(3), which would require individual notice so that putative class members could exercise opt-out rights); *Oshana*, 225 F.R.D. at 578 (seeking discouragement of profits and damages with the putative class); *Harris*, 127 F.R.D. at 658 (seeking lost wages and punitive damages, in addition to equitable relief, for the putative class); *Noble v. 93 University Place Corp.*, 224 F.R.D. 330, 334 (S.D.N.Y.2004) (seeking monetary damages for unpaid overtime). In contrast, in this case, the nature of the declaratory and injunctive relief sought eliminates any need for individual determination of damages, and dramatically decreases the likelihood that the Court would need to establish specifically the identity of each member of the class at a later point in the adjudicative process in order to grant relief. *Williams v. Lane*, 129 F.R.D. 636, 640 (N.D.Ill.1990).[4] *See also 5 Moore's Federal Practice* § 23.21[5] at 23–55

---

**3.** We note that even apart from these distinctions, there is a difference of opinion as to whether the *Crosby* analysis is correct. In *Barnett v. Bowen*, 794 F.2d 17 (2d Cir.1986), the court reversed the denial of certification of the proposed class of "all present and future applicants for SSI disability benefits whose initial claims are denied ... and who subsequently request a reconsideration hearing." The *Barnett* court held that "it would still be appropriate to define a class to include all applicants who may experience unreasonable delays [in obtaining hearings] ..., despite the fact that the point at which delays become unreasonable may vary with the facts and circumstances of individual cases." 794 F.2d at 23.

**4.** Of course, should the case evolve in a way that demonstrates the contrary, and specific identity of individual class members becomes important,

the Court retains equitable power to decertify the class. *See 8 Newburg on Class Action* § 24:71 (Fourth Ed.2006). *See McDonald v. Chicago Milwaukee Corp.*, 565 F.2d 416 (7th Cir.1977) (where court initially certifies, "it retains full power to alter or amend its ruling later" pursuant to Rule 23(c) (1) and "[s]hould it appear very early in the course of litigation that ... dissimilar interests ... make the named party's representative status unfair to absent class members, the court would no doubt decertify"). *See generally Isaacs v. Sprint Corp.*, 261 F.3d 679, 679–82 (7th Cir.2001) (court exercised discretion on interlocutory review of class certification order to decertify a class it found did not satisfy Rule 23 prerequisites, despite district court's power to decertify or "change" the certification order during the pendancy of the case).

(3d ed.2005) (in a Rule 23(b)(2) class action seeking declaratory and injunctive relief, a precise class definition is less critical than in other types of class actions).

For these reasons, we conclude that the proposed classes, as modified, are sufficiently definite to satisfy this prerequisite to certification.

## IV.

We now turn to the question of whether plaintiffs satisfy the four prerequisites to class certification set forth in Rule 23(a). Plaintiffs do not challenge the adequacy of representation that would be provided by plaintiffs and their counsel (Rule 23(a)(4)), but focus their attack on the other three prerequisites under Rule 23(a): numerosity, typicality, and commonality (Defs.' Mem. at 8). We address each of those challenged prerequisites below.

## A.

Rule 23(a)(1) requires that a proposed class be so numerous that joinder is impracticable in order to be certified. Fed.R.Civ.P. 23(a)(1). While plaintiffs cannot rely on conclusory allegations or pure speculation, the party seeking certification need not establish the exact number of persons in the class. *Marcial v. Coronet Ins. Co.*, 880 F.2d 954, 957 (7th Cir.1989). When it is difficult to ascertain the size of a class, a good faith estimate is sufficient. *Rahim v. Sheahan*, 2001 WL 1263493, *12 (N.D.Ill. Oct.19, 2001) (citation omitted). A court may also rely on "common sense assumptions" and reasonable inferences to determine if the numerosity requirement is met. *Id.* (citation omitted). Whether joinder is practicable depends upon factors other than class size, such as the geographic dispersion, the type of relief

sought, and the feasibility of relitigating core issues. *Vodak v. City of Chicago*, 2006 WL 1037151, *4 (N.D.Ill. April 17, 2006) (citation omitted).

The plaintiffs propose to certify the primary traveler class and the family detainee class. We will address the numerosity evidence with respect to these two classes separately.

## 1.

In their opening brief, plaintiffs estimate the number of persons within the primary traveler class by pointing to statistics contained in the Department of Justice's *Review of the Terrorist Screening Center* for evidence of numerosity (Pls.' Mem., Ex. 2).[5] In June 2005, the TSDB contained over 270,000 names. See http://www.usdoj.gov/oig/reports/FBI/a0534/final.pdf at p. 17. The TSDB includes U.S. Citizens. See http://www.fbi.gov/terrorinfo/counterterroism/faqs. Plaintiffs assert that over 12,000 people were detained by Customs and Border protection and screened by the TSC during a 14–month period; that more than 7,000 of those screened during the period were not listed in the TSDB; and that nearly 32,000 records in the TSDB were assigned improper threat level codes (Pls.' Mem. at 7).

In their reply brief, plaintiffs further refine their class size estimate that: (1) of the "misidentified" class of persons (approximately 7, 775 detentions), approximately 40 percent of the detentions generated calls to the TSC (Ex. 2, App.III); and (2) during the 14–month period from December 2003 through January 2005, calls from border officials of the U.S. Customs and Border Protection ("CBP") comprised 67 percent of the calls to the TSC. (*Id.*). The plaintiffs posit that it is "reasonable to assume that CBP

---

5. As for the "over-classified" persons within the primary traveler class, the plaintiffs indicate that they "cannot estimate the number of over-classified members" because defendants have sole access to that information and they have not yet disclosed it to plaintiffs (Pls.' Reply at 8). Plaintiffs point out that this Court has previously held that any questions on numerosity should be resolved in favor of the plaintiff where the defendant offers no evidence contrary' to plaintiff's estimate. *See Ingram v. Corporate Receivables, Inc.*, 2003 WL 21982152, *3 (N.D.Ill.2003). *See* *also Rahim*, 2001 WL 1263493, *12 (accepting plaintiffs' "uncontradicted assertion"). Because there is no evidence offered and defendants have not yet answered the complaint, the Court will assess numerosity based on the evidence available for the primary travelers class as a whole, without regard to those who may be within that class due to policies that allegedly lead to over-classification and those who may be within the class due to policies that allegedly lead to mis-identification.

was also responsible for 67 percent or 5,195, of the misidentifications within that period" (Pls.' Reply at 6). The plaintiffs also posit that it is reasonable to assume that some portion of the misidentified persons are U.S. Citizens (*Id.*). Plaintiffs estimate 40 percent or 2,078 of the 5,195 CBP detentions is a good faith estimate "because U.S. citizens comprise 40 percent of the people entering the United States" (Pls.' Reply at 6–7) (citing http://trac.syr.edu/immigration/reports/142/).

Alternatively, plaintiffs estimate in their reply brief that "even if *only* 1% of CBP misidentifications were citizens, there would be at least 52 citizens misidentified during the OIG Report's 14–month period, or 3.71 citizens per month." (Pls.' Reply at 7). Plaintiffs suggest that "[b]y extrapolation, at least 137 citizens were misidentified by CBP officers between December 2003 and December 2006[,]" and "[t]hese conservatively estimated 137 misidentified citizens alone satisfy numerosity." *See Rahim,* 2001 WL 1263493, *12 (stating that courts have certified classes of "10 to 40" people); *Kazarov v. Achim,* 2003 WL 22956006, *4, *8 (N.D.Ill.2003) (certifying a class of 13 members).

The defendants argue that the numerosity prerequisite has not been satisfied because plaintiffs rely on numbers which capture a broader group of people than those in the proposed classes and fail to offer a method for narrowing the estimate (Defs.' Mem. at 9). Defendants are correct that plaintiffs' original class definition may capture many individuals who would not qualify as members of the proposed class. The statistics indicate that a significant number of people are detained at the border and subjected to screening by the TSC, but they do not establish how many of those individuals are U.S. citizens or which have been subjected to "unreasonable" treatment as a result of the challenged policies. However, plaintiffs have modified the proposed class definition to eliminate individualized considerations for determining class membership. Their focus, instead, is on the policies, practices or customs that, according to plaintiffs, are unconstitutional and that lead to detentions. Based on the newly modified definition, this

Court finds that plaintiffs satisfy the numerosity requirement for the following reasons.

*First,* it is reasonable to infer from the identification of the named plaintiffs, allegations of standard policies, and the large number of possible class members (12,000 detainees in 14 months) that the size of the proposed class is significant in number. The statistical evidence and number of named plaintiffs alone are sufficient to distinguish this case from two of the cases cited by the defendants in support of their position that numerosity is not satisfied (Defs.' Mem. at 8–9 (citing *Steinbrecher v. Oswego Police Officer Dickey,* 138 F.Supp.2d 1103, 1106 (N.D.Ill.2001)) (one named plaintiff and no statistical evidence) and *Jiang v. Allstate Ins. Co.,* 199 F.R.D. 267, 269–70 (N.D.Ill. 2001) (no evidence beyond particular claims of three named plaintiffs)). *Second,* since a single, nationwide class is proposed, the members will necessarily be geographically dispersed, and joinder would be impractical. *Third,* since the plaintiffs seek declaratory and injunctive relief, the remedy would protect the rights of future class members for whom joinder is necessarily impracticable. *See Rosario v. Cook County,* 101 F.R.D. 659, 661 (N.D.Ill.1983). *Fourth,* forcing the parties to relitigate the core issues of the constitutionality of the challenged policies, practices and customs in different suits and in different courts throughout the country would be expensive and inefficient.

Defendants' argument that the plaintiffs' estimate is "speculative" rather than in good faith, and thus an inappropriate basis upon which to certify the class, *see Marcial v. Coronet Ins., Co.,* 880 F.2d 954 (7th Cir. 1989), is not persuasive. While it is true that the fact pattern in *Marcial* is analogous to that in the present case, the *Marcial* result should not be controlling here. *First,* the number of possible class members (*i.e.,* those who meet the initial criteria) in this case is far greater than in *Marcial* (400–600 total compared to 12,000 over 14 months). Thus, only a small fraction of possible class members in this case need actually turn out to be class members that make joinder impracticable in this case. *Second,* non-size factors present in this case were not at issue in

*Marcial* (*e.g.*, the fact that there is a single, nationwide class which is geographically dispersed). *Third*, the Seventh Circuit's conclusion that denial of the class in *Marcial* was not an abuse of discretion does not mean that certifying the class would have been improper.

Thus, for all the reasons discussed above, the Court finds that the numerosity prerequisite is met in this case.

### 2.

The Court finds that the family detainee class is sufficiently numerous as well. The plaintiffs are entitled to make common-sense assumptions to satisfy numerosity. Plaintiffs argue that it is common sense that "many primary traveler class members travel abroad with their families" and "[a]ll of these family members are subject to defendants' policies and practices" (Pls.' Reply at 8). In their complaint, plaintiffs allege that "thousands" of people fall into the family detainee class "[a]s a result of defendants' policies, practices and customs" (Ex. 1, ¶ 31(a)). Plaintiffs assert that "[t]he courts regularly certify classes of similar sizes" (Pls.' Reply at 13, citing *Wallace v. Chicago Housing Authority*, 224 F.R.D. 420, 427 (N.D.Ill.2004) (noting that a class size of 1000 or more "easily meets Rule 23(a)'s numerosity requirement")).

The defendants make no specific objections to the family detainee class, but merely assert that numerosity cannot be established for this class because it is "dependent on establishing that the 'primary traveler class' is sufficiently numerous" (Defs.' Resp. at 10, n. 2). For the reasons stated in support of finding numerosity sufficient for the primary traveler class, the Court also finds numerosity sufficient for the family detainee class.

### B.

▮ The commonality element is satisfied when "there are questions of law or fact common to the class." Fed.R.Civ.P. 23(a)(2). It is typically sufficient to show that there is a common nucleus of operative facts underlying the individual claims. *Clay*, 188 F.R.D. at 491. The requirement is generally permissive, such that factual variations in individual claims should not defeat a finding of commonality, as long as the class has at least one issue of law or fact in common. *Wallace*, 224 F.R.D. at 427. Generally, a plaintiff meets the commonality requirement if he shows that "the defendants have engaged in standardized conduct towards members of the proposed class." *Clay*, 188 F.R.D. at 491.

Defendants argue that the commonality element is not satisfied in this case because plaintiffs have not alleged a "deliberate plan or policy" directed "specifically toward members of the proposed classes" (Defs.' Mem. at 13–14). Instead, argue defendants, plaintiffs complain only about "internal operating procedures," which defendants claim cannot be directed at the plaintiff class; and, factual variations in the claims of the named plaintiffs illustrate that "highly individualized showings" are required to ascertain whether plaintiffs' constitutional rights have been violated. *Id.* (citation omitted).

For their part, plaintiffs maintain that commonality is satisfied because of the defendants' common policies, practices, and customs related to: (1) misidentification of class members who are not actually on TSDB lists; (2) over-classification of class members who are listed, and who are described as dangerous when they are not; (3) granting unfettered discretion to agents; and (4) failing to adequately train and supervise agents (Pl.'s Mem. at 9). Plaintiffs claim there are common questions of law related to whether these practices violate the Fourth and Fifth Amendments. *Id.*

The Court finds that the commonality element has been satisfied. Assuming plaintiffs' allegations are true, by definition the claims of the class members in the case will have facts in common in that they were detained at the border and either misidentified or over-classified in the TSDB. They all will have been subject to the same policies, practices and customs that are allegedly unconstitutional. This is sufficient for a finding of commonality under the permissive standard applied by the courts.

Defendants' contrary position seems to rely on the notion that the "standardized

conduct" giving rise to the common questions of law and fact must be intentionally directed specifically toward the plaintiff class members. However, the defendants do not provide any authority for this proposition and instead cite to cases which suggest that the need for individualized determinations defeats a finding of commonality. As we have explained above, plaintiffs' modified class definitions focus on defendants' alleged policies, practices and customs, and do not require individual "minitrials" of each class member. Thus, defendants' argument does not provide a sound basis to defeat a finding of commonality.

## C.

In order to certify a class, "the claims ... of the representative parties [must be] typical of the claims ... of the class[.]" Fed. R.Civ.P. 23(a)(3). The typicality requirement is met if the claims of the named parties "have the same essential characteristics" as those of the class at large. *RCPA,* 7 F.3d at 597 (quotation omitted). In other words, the named plaintiffs' claims are typical if they arise out of the same event, practice, or course of conduct and rely on the same legal theory. *Clay,* 188 F.R.D. at 491. The claims may be typical because of the similarity in legal theory even if there are some factual differences in the claims. *Id.* This requirement is closely related to the commonality requirement, but serves the function of ensuring that the representative plaintiffs will effectively advance the interests of the class, while pursuing his or her own self-interest. *Id.*

Defendants argue that the plaintiffs have not satisfied the typicality element here because determining liability "requires an individualized inquiry" into the factual circumstances of each claim (Defs.' Mem. at 10–13). Defendants point to specific factual variations in the allegations of the named plaintiffs (*i.e.,* that some were handcuffed, a few were "body-searched," and one was held at gun point). *Id.* at 12–13. In essence, this is the same argument the defendants make to claim that the class is not adequately defined and that the commonality element is not satisfied.

As a general rule, the proposition that typicality is not satisfied when liability turns on individualized factors is undoubtedly correct. *See, e.g., Jones v. Takaki,* 38 F.3d 321 (7th Cir.1994) (finding lack of typicality because Supreme Court precedent made clear that claim would be analyzed under a "fact-specific balancing test"). Thus, if plaintiffs' claims for class relief in this case depended upon such fact specific elements as the length of the detention and nature of restraints used with respect to each class member, then the plaintiffs have likely failed to adequately define the class or satisfy the commonality or typicality requirements.

But, that is not the class theory of liability that plaintiffs assert. Plaintiffs characterize their suit as a challenge to the defendants' "policies, practices, and customs." As they have postured them, plaintiffs' class claims permit a determination of the constitutionality of defendants' alleged policies, practices and customs which does not rely on individualized factual considerations for each putative class member. Accordingly, a finding of typicality is justified because the claims of the representative plaintiffs, if true, have the same essential character as those of the class as a whole in that they were subject to the alleged unconstitutional policies, practices or customs.

## V.

In addition to satisfying the prerequisites of Rule 23(a), the plaintiffs must demonstrate that one of the Rule 23(b) conditions is also satisfied. Here, plaintiffs seek certification under Rule 23(b) (2), which requires a finding that the "party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole." Fed.R.Civ.P. 23(b)(2). Although the primary limitation on certification under Rule 23(b)(2) is the type of relief actually sought, *see Lemon v. International Union of Operating Engineers, Local No. 139,* 216 F.3d 577, 580 (7th Cir.2000), the court still should consider whether the presence of individual issues precludes certification. *Dham-*

*er v. Bristol–Myers Squibb Co.*, 183 F.R.D. 520, 529 (N.D.Ill.1998).

In this case, the plaintiff classes seek only injunctive relief; there are no ancillary requests for class monetary relief that might render Rule 23(b)(2) inapplicable. Defendants' objection to the use of Rule 23(b)(2) as a basis of certification is based on what they claim are the individualized elements involved in the class members' claims (Defs.' Mem. at 14–15). As we have explained above, the plaintiffs' class definitions and theories of liability do not require individualized determinations. Accordingly, the Court finds that plaintiffs have satisfied the requirements necessary for certification under Rule 23(b)(2).

### VI.

Plaintiffs also seek to have their counsel of record appointed as class counsel. Defendants have not challenged the ability of plaintiffs' counsel to fairly and adequately represent the class, which is the standard we use for appointing class counsel under Rule 23(g)(1)(B). We have considered the criteria required by Rule 23(b)(1)(C), and find that counsel of record amply satisfy those criteria: (1) the briefs make clear that they have done significant work to date in investigating and developing plaintiffs' claims; (2) they are highly experienced in class action litigation involving complex constitutional and other civil rights matters; (3) they are well-familiar with the applicable law; and (4) they have indicated a willingness and ability to commit the resources necessary to fully litigate this matter. Accordingly, we recommend that plaintiffs' counsel of record be appointed class counsel.

### CONCLUSION

If plaintiffs are able to prove that the defendants' challenged policies, practices and customs are unconstitutional, then liability would not turn on individualized determinations for class members and class-wide injunctive relief would be appropriate. Concerns about manageability of the case should be alleviated because the plaintiffs only seek declaratory and injunctive relief with no incidental monetary damages or other relief that would require individual determinations, or individual notice to or identification of specific class members.

Therefore, this Court respectfully recommends that plaintiffs' motion for class certification be granted: (a) we recommend certification of the Rule 23(b)(2) classes set forth on pp. 1–2 of this opinion, subject to the district court exercising its equitable power to decertify or redefine the classes should individual issues turn out to be more prevalent as the case proceeds to later stages, and (b) we recommend that plaintiffs' counsel of record be appointed class counsel under Rule 23(g).

Specific written objections to this report and recommendation may be served and filed within 10 business days from the date that this order is served. Fed.R.Civ.P. 72(b). Failure to file objections with the district court within the specified time will result in a waiver of the right to appeal all findings, factual and legal, made by this Court in the report and recommendation. *See Video Views, Inc. v. Studio 21, Ltd.*, 797 F.2d 538, 539 (7th Cir.1986).

Dated Jan. 16, 2007.